# 26-0909

# United States Court of Appeals

*for the*

# Second Circuit

TRUCKING ASSOCIATION OF NEW YORK,

*Plaintiff-Appellant,*

– v. –

METROPOLITAN TRANSPORTATION AUTHORITY,
TRIBOROUGH BRIDGE AND AUTHORITY,

*Defendants-Appellees,*

LETITIA JAMES, in her capacity as Attorney General for the State of New York,

*Intervenor-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

BRIAN D. CARR
JONATHAN E. HANSEN
MONACO COOPER LAMME & CARR, PLLC
*Attorneys for Plaintiff-Appellant*
1881 Western Avenue, Suite 200
Albany, New York 12203
(518) 855-3535

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (515534)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, Defendant-Appellant New York State Motor Truck Association, Inc. certifies that it is a Domestic Not-For-Profit Corporation, and that no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

JURISDICTIONAL STATEMENT ..... 1

STATEMENT OF THE ISSUES ..... 1

STATEMENT OF THE CASE/SUMMARY OF ARGUMENT ..... 2

RELEVANT PROCEDURAL HISTORY ..... 8

STATEMENT OF FACTS ..... 8

Background on TANY and the Trucking Industry in New York State ..... 9

The Congestion Pricing Toll ..... 11

ARGUMENT ..... 18

STANDARD OF REVIEW ..... 18

POINT I

CONGESTION PRICING VIOLATES THE DORMANT COMMERCE CLAUSE BECAUSE THE HEAVY TOLL BURDEN ON COMMERCIAL TRUCKS IS NOT A FAIR APPROXIMATION OF USE ..... 19

POINT II

CONGESTION PRICING IS PREEMPTED BY FAAAA BECAUSE IT RELATES TO THE PRICES, ROUTES, AND SERVICES OF MOTOR CARRIERS ..... 25

POINT III

THE DISTRICT COURT APPLIED THE WRONG STANDARD OF REVIEW FOR A RULE 12(b)(6) MOTION, MISTAKENLY REQUIRING TANY TO SUPPORT ITS CLAIMS WITH EVIDENCE DESPITE NO DISCOVERY HAVING BEEN CONDUCTED ..... 32

CONCLUSION ..... 36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

American Liberties Ass'n v. Pataki,
969 F.Supp. 160 (S.D.N.Y. 1997) ....................19, 25

Anderson News, LLC v. Am. Media, Inc.,
680 F.3d 162 (2d Cir. 2012) ....................35

Bedoya v. Am. Eagle Express,
914 F.3d 812 (3d Cir. 2019) ....................28

Bell Atlantic Corp. v. Twombly,
550 U.S. 544 (2007) ....................18, 32

Chambers v. Time Warner, Inc.,
282 F.3d 147 (2d Cir. 2002) ....................19

Colorado Motor Carriers Ass'n v. Town of Vail,
No. 123CV02752CNSSTV, 2023 WL 8702074 (D. Colo. Dec. 15, 2023) ..........31

Crosby v. Nat'l Foreign Trade Council,
530 U.S. 363 (2000) ....................25

Evansville-Vanderburgh v. Delta Airlines, Inc.,
405 U.S. 707 (1972) ....................20

Fed. Exp. Corp. v. California Pub. Utilities Comm'n,
936 F.2d 1075 (9th Cir. 1991) ....................27

Georges v. Detroit Pizza NYC LLC,
2024 U.S. Dist. LEXIS 51634 (S.D.N.Y. March 20, 2024) .................... 18-19

GMC v. Tracy,
519 U.S. 278 (1997) ....................19

Industria Y Distribuction de Alimentos v. Suarez & Co.,
797 F.3d 141 (1st Cir. 2015) ....................19, 20

Jones v. Treubig,
963 F.3d 214 (2d Cir. 2020) ....................21

Kloppel v. Sears Holding Corp.,
2018 U.S. Dist. LEXIS 33606 (W.D.N.Y. Feb. 28, 2018) ....................26

L-7 Designs v. Old Navy, LLC,
647 F.3d 419 (2d Cir. 2011) ........ 18

Lavender v. Manheim's PA. Auction Servs.,
399 Fed. Appx. 649 ........ 21

Loomis Sayles Trust Co., LLC v. Citigroup Glob. Mkts., Inc.,
2024 U.S. Dist. LEXIS 175526 (S.D.N.Y. Sept. 26, 2024) ........ 21

Matson v. Bd. of Educ. of the City Sch. Dist. of NY,
631 F.3d 57 (2d Cir. 2011) ........ 32, 33

Northwest Airlines, Inc. v. Cty. of Kent,
510 U.S. 355 (1994) ........ 20

Nw., Inc. v. Ginsberg,
572 U.S. 273 (2014) ........ 26

NYS Motor Truck Ass'n v. Pataki,
2004 U.S. Dist. LEXIS 25519 (S.D.N.Y. Dec. 16, 2004) ........ 26

Rowe v. N.H. Motor Transp. Ass'n,
552 U.S. 364 (2008) ........ 26

Sacerdote v. New York Univ.,
9 F.4th 95 (2d Cir. 2021) ........ 18

Selevan v. New York Thruway Auth.,
711 F.3d 253 (2d Cir. 2012) ........ 20

Simon Prop. Group, L.P. v. Lumbermen's Mut. Cas. Co.,
459 Fed. Appx. 16 (2d Cir. 2012) ........ 20

**Statutes & Other Authorities:**

U.S Const. Art. I, § 8, Cl. 3 ........ 19

28 U.S.C. § 1291 ........ 1

28 U.S.C. § 1331 ........ 1

49 U.S.C.S. § 14501(c)(1) ........ 25

Federal Rule of Civil Procedure 12(b)(6) ........ *passim*

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims of Plaintiff-Appellant, Trucking Association of New York (hereinafter "TANY"), arise under the Constitution and the laws of the United States. On March 10, 2026, the district court issued an Opinion and Order dismissing TANY's Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The Clerk subsequently entered a Judgment on March 11, 2026, which closed the case. TANY filed a timely Notice of Appeal on April 8, 2026. This Court has subject matter jurisdiction under 28 U.S.C. § 1291. This appeal is from a final order that disposed of all of TANY's claims.

## STATEMENT OF THE ISSUES

1. Whether the Central Business District Tolling Program violates the Dormant Commerce Clause of the U.S. Constitution because the toll structure is not a fair approximation of use in that it charges commercial trucks the most heavily despite them making up only 4% of vehicle traffic.
2. Whether the Central Business District Tolling Program is preempted by the Federal Aviation Authorization Act of 1994 because it intends to interfere, and has the practical effect of interfering with, the prices, routes and services of motor carriers.

3. Whether the district court applied the incorrect standard for a FRCP 12(b)(6) motion by requiring TANY to provide evidence to support their claims, despite no discovery having been conducted.

## STATEMENT OF THE CASE/SUMMARY OF ARGUMENT

This appeal challenges an unprecedented exercise of local tolling power: the Central Business District Tolling Program (hereinafter "Congestion Pricing" or "Tolling Program"). Congestion Pricing is a first-of-its-kind scheme that taxes access to the Nation's premier commercial district and does so by singling out the vehicles that are the economic engine of New York City – commercial trucks. The district court treated this case as just another toll dispute, analogizing it to prior cases with little to no relevance to Congestion Pricing, when the Constitution requires the opposite: careful, skeptical scrutiny of a novel revenue mechanism with sweeping interstate consequences. Indeed, New York was the first American city to enact Congestion Pricing, but it certainly will not be the last. Cities across the country are looking to New York's model as a blueprint, so it is crucially important that New York – and the Courts – get it right.

To begin with, the Dormant Commerce Clause does not ask whether a toll is politically popular or administratively convenient; it asks whether the charge is a permissible user fee. In the context of this appeal, that question is whether the toll is a

fair approximation of use. The district court cited prior toll cases as though they resolved the dispute, but Congestion Pricing is not a bridge toll, a highway toll or a ferry toll. It is a new kind of exaction, designed not merely to fund a facility used by the payer, but to *prevent* users from using that very facility. That wrinkle makes this case a matter of first impression in every meaningful sense, and it demanded a careful and nuanced application of the "fair approximation" test, not a citation string and a shrug.

Discovery has not yet been conducted in this matter. Yet, even on the limited facts in the record, the "fair approximation" problem is glaring. Trucks comprise only 4% of vehicle traffic in Midtown Manhattan, yet they bear, by far, the heaviest tolls. A toll structure that extracts the most from a tiny fraction of the users is not a "fair approximation of use." This is especially and uniquely true here, where the entire purpose of the toll is to reduce traffic congestion.

The trucking industry keeps New York's economy functioning 365 days a year, so the constitutional defect here is not merely academic. Rather, it is the predictable result of converting a purported "user fee" into a cash cow for the MTA, financed disproportionately by interstate and regional motor carriers whose "use" of the congestion zone is dictated by customer demand and the practical realities of delivering goods to those customers. To put it another way, commercial trucks cannot simply choose to avoid the toll, because there are thousands of businesses in lower Manhattan depending on them to make deliveries when and where they are needed. Thus, to toll

trucks at a higher rate than other vehicles when they make up only 4% of traffic in the zone and are unable to avoid entering it, all in the name of reducing traffic congestion, is perverse.

The district court chose deference to the MTA over careful analysis. The "fair approximation" test is a real-life, Constitutional constraint designed to prevent governmental overreaching. The district court instead treated it like an elusive concept that is perpetually on the periphery even where, here, it is plainly right in front of our eyes. Fair approximation exists precisely to prevent states and local authorities from disguising general revenue measures as "tolls" and exporting the costs to politically disfavored or underrepresented market participants. By refusing to grapple with whether the toll burden tracks actual use – especially where trucks are a small minority of vehicles but the largest source of revenue – the district court insulated a novel and aggressive scheme from the constitutional scrutiny the Dormant Commerce Clause demands.

The district court also got it wrong on the Federal Aviation Authorization Act of 1994 ("FAAAA"). Congress enacted FAAAA to prevent precisely what the MTA has done here: impose local measures that, in practical effect, regulate motor carriers' prices, routes, and services through economic compulsion. The preemption clause of FAAAA is written broadly, barring state or local provisions "related to" motor carrier prices, routes, or services, subject to limited exceptions. Courts interpreting this

language have rejected cramped readings that would limit preemption to laws that directly proscribe rates, routes, or services, because that would erase the breadth Congress chose.

The district court nevertheless treated the absence of literal "force" as dispositive. That is not how "related to" preemption works. A toll that predictably and substantially changes the economics of serving lower Manhattan does not need to command a motor carrier to use a different route to be preempted by FAAAA. For all practical purposes, the scheme compels carriers to alter rates (to recover the toll), routes (to avoid or minimize it), and services (to adjust delivery times or frequency) in order to meet customer demands in Midtown Manhattan. Indeed, these wholesale changes to the way motor carriers do business were expressly intended by MTA. Such changes are further complicated by operational complexity and exorbitant administrative burdens already imposed on the trucking industry, which MTA simply expects the industry should continue to shoulder. This is exactly the kind of local interference that Congress sought to foreclose when it required national uniformity for motor carriers operating in interstate commerce.

The district court further erred by crediting MTA's nonsensical argument that even if FAAAA preemption did apply here, the Tolling Program would be permissible under the exception that preserves the State's authority to impose highway route controls or limitations based on the size or weight of a vehicle. The Tolling Program

was never structured or implemented to use weight or size as a method to control what kinds of vehicles can enter the Central Business District. This is because the stated purpose of the Tolling Program is to reduce traffic in the Zone, not to prevent vehicles of certain weights and sizes from entering. If the vehicle classifications under the Tolling Program were "based on the size or weight of the motor vehicle", then vehicle classes of similar weights and sizes should be tolled equally. Instead, transit buses of at least the same size and weight of many delivery trucks are completely exempt from the Tolling Program. To fully exempt transit buses while simultaneously imposing the heaviest toll burden on delivery trucks of equal size and weight flies in the face of MTA's argument, and the district court erred in holding otherwise.

It should also be emphasized that the defenses advanced by MTA with respect to TANY's fair approximation and FAAAA claims, which were ultimately endorsed by the district court in its decision to dismiss the Amended Complaint, are fundamentally incompatible with each other. The district court endorsed the tolling structure set forth by the MTA and its reporting, which expressly stated its goals to incentivize truck drivers to shift their routes outside of peak periods and to encourage the "optimization of deliveries" by trucks within the Zone. These are the explicit, intentional goals of the Tolling Program: to affect motor carrier routes through the imposition of higher and more frequent toll charges. The MTA cannot then turn around and argue, in response to TANY's preemption claim under FAAAA, that the Tolling Program will not affect

carriers' rates, routes, or services. These two positions are not only belied by the record before, but the inconsistencies cannot be remedied even if considered in a vacuum. This case called for judicial engagement, not judicial endorsement. Congestion Pricing is a bold and novel law with profound implications for the trucking industry, supply chains, and the cost of doing business in New York City. Yet, the district court declined to confront the hard questions: whether the toll is a constitutionally permissible user fee under the "fair approximation" standard, and whether it is preempted because it effectively dictates motor carrier pricing, routing, and service decisions. Instead, the court treated the MTA's asserted policy goals as a substitute for legal analysis, politicizing what should have been a disciplined application of constitutional and statutory limits.

The Second Circuit should reverse. The Dormant Commerce Clause does not permit the MTA to finance its transit ambitions by imposing a disproportionate toll burden on the trucking industry completely untethered to actual use. Moreover, FAAAA does not permit the MTA to accomplish indirectly (through a punitive, revenue-driven toll regime) what it cannot do directly: regulate motor carriers' prices, routes, and services.

## RELEVANT PROCEDURAL HISTORY

TANY commenced this action by filing a Complaint in the Southern District of New York and simultaneously making a motion for preliminary injunction. MTA made a Rule 12(b)(6) motion to dismiss TANY's Complaint. The lower court issued separate decisions denying TANY's motion for preliminary injunction and granting without prejudice MTA's motion to dismiss the Complaint. TANY filed an Amended Complaint and MTA thereafter moved to dismiss the Amended Complaint. The lower court issued a decision granting MTA's motion to dismiss TANY's Amended Complaint.

The record herein includes all of these papers because in its decision granting MTA's motion to dismiss the Amended Complaint, the lower court referenced its prior decisions on the previous motions in this case. That being said, the only decision being appealed from is the last decision, which dismissed TANY's Amended Complaint, and the only question before this Court is whether TANY's Amended Complaint meets the Rule 12(b)(6) standard.

## STATEMENT OF FACTS

TANY's Statement of Facts is taken directly from its Amended Complaint and, therefore, must be accepted as true for purposes of a Rule 12(b)(6) motion.

Background on TANY and the Trucking Industry in New York State

TANY is a not-for-profit trade association dedicated to representing the interests of the trucking industry in New York, with the efficient and safe movement of freight being the top priority for the Association. (A-24). TANY's membership is comprised of a wide array of motor carrier companies with a business presence in New York State, ranging from single truck owner-operators to large national fleets. Id. Membership in the Association also includes companies that service the motor carrier, trucking, and freight industries. Id. Most of TANY's members are small - to mid-sized family owned and operated fleets. Id.

The critical importance of New York's trucking industry cannot be overstated. (A-25). In New York, there are approximately 46,000 trucking companies in operation, with the majority being small, locally owned businesses utilizing fewer than 20 trucks. Id. These small enterprises play a crucial role in the state's economy, representing one out of every 28 jobs. Id. Nearly 90 percent of New York communities rely exclusively on trucks to transport their goods, and over 96 percent of all manufactured products are shipped by trucks. Id. Furthermore, more than two million businesses across New York State, regardless of their size, depend on efficient goods transportation for their factories, stores, and customers. Id. As set forth in more detail below, the state's trucking industry is particularly critical to the economic vitality and success of the New York City metro region, and, as relevant here, lower Manhattan. Id.

The trucking industry is appropriately heavily regulated, but it is also heavily taxed. (A-25). TANY members abide by federal and New York State labor and wage laws that are unique to the freight industry and pay a host of additional charges and taxes imposed upon their operations in New York. Id. The trucking industry in New York paid approximately $979 million in federal and state roadway taxes in 2023. Id. This represents 29 percent of all taxes owed by New York motorists despite trucks representing only 7 percent of all vehicle miles traveled in the state. Id. To break this down to a per truck basis, a typical tractor trailer combination in New York pays $23,680 in state and federal highway user fees, over $13,000 of which (i.e., more than half) is attributable to New York registration fees and fuel tax. Id. These taxes are over and above the typical taxes paid by businesses in New York. Id.

Commercial vehicles are charged a Highway Use Tax, exclusive to commercial vehicles, for every mile traveled in New York State, including in Manhattan. (A-25). Specific to operating in Manhattan, commercial vehicles are subject to the Commercial Motor Vehicle Tax as well as significant parking fines resulting from a lack of enforcement in loading zones and a lack of commercial parking space throughout Manhattan. (A-26). TANY members are further faced with bridge and tunnel tolls of between $87.50 and $115 simply to enter Manhattan depending on the time of day and whether E-ZPass is used. Id. As such, TANY trucks are already over-burdened and are

now being confronted with the implementation of an outrageous and unconstitutional toll on the trucking industry. Id.

The Congestion Pricing Toll

Congestion Pricing differs substantially from existing taxes imposed on TANY vehicles, which are based solely on vehicular weight and size. Congestion Pricing was not enacted for the purpose of regulating vehicular weight or size, or for accounting for wear and tear on the roadway. Rather, according to the Traffic Mobility Review Board's final report to MTA in November 2023 regarding the structure of the Tolling Program[1], the Program was implemented to reduce congestion in the Central Business District of Manhattan (hereinafter "Zone") and generate $1 Billion in net annual revenue to fund $15 Billion for capital projects for public transit and commuter rail improvements.[2] (A-27). In this report, the TMRB made the following recommendations to MTA regarding toll rates, credits, discounts, and exemptions for the implementation of the Tolling Program, which were subsequently approved by MTA[3]:

a) Passenger vehicles should be charged a $15 toll for entering the Zone, no more than once per day;

[1] The TMRB Report is incorporated by reference in TANY's Amended Complaint (A-26) and can be found online at: https://new.mta.info/document/127761

[2] MTA has reported that 80% of the profit from the Tolling Program will be used to improve New York City Transit (subways and buses), 10% will be allocated to the Long Island Railroad, and 10% will be allocated to Metro-North Railroad.

[3] This price structure will be phased in over six years, but the toll for each vehicle class *relative to one another* will be the same. (A-29).

b) Trucks should be charged a $24 or $36 toll (depending on size) each and every time they enter the Zone;

c) Toll rates should be 75% lower after 9:00 pm;

d) For-Hire Vehicles (such as Uber and Lyft), along with New York City taxis, are fully exempt from the Tolling Program.[4]

(A-26-27).

The TMRB Report noted that the Tolling Program must reduce congestion in the Zone and generate $1 Billion in net annual revenue to fund $15 Billion for capital projects for transit and commuter rail improvements. (A-27). According to statistics contained in the TMRB Report, trucks make up only 4% of all vehicle traffic in the Zone, while For-Hire Vehicles and taxis (both exempted classes of vehicles) make up 52% of all traffic in the Zone. Id.

The TMRB Report speculated that charging lower rates during overnight hours may help to incentivize truck drivers to shift their hours of travel into the Zone to less congested times. Id. The TMRB Report stated that the charges for trucks were based, in part, on the need to encourage the "optimization of deliveries" to reduce trucks' contribution to congestion in the Zone. Id.

---

[4] Instead of taxis and For-Hire Vehicles paying a $15 toll for entering the Zone, a nominal surcharge of $1.25 or $2.50 per trip to, from, within or through the Zone is automatically charged to their customers. These classes of vehicles are not charged a toll for entry into the Zone and, thus, are exempt from the Tolling Program. (A-22).

MTA has reported that 80% of the profit from the Tolling Program will be used to improve New York City Transit (subways and buses), 10% will be allocated to the Long Island Railroad, and 10% will be allocated to Metro-North Railroad. (A-23).

TANY has continuously advocated against the Tolling Program on behalf of its members, offering alternatives to ensure an equitable implementation of the Tolling Program. (A-27). TANY has advocated for an exemption of the supply chain industries from the Tolling Program; pricing parity between trucks and passenger vehicles; or, at the very least, a once-per-day charge to trucks entering the Zone, similar to that afforded to passenger vehicles, or any combination of these alternatives. (A-27-28). MTA failed to include any of TANY's proposals in the Tolling Program implementation plan and have instead ensured that the Tolling Program disproportionally targets TANY members. (A-28).

Hundreds of millions of tons of freight are moved into or out of New York City each year. (A-29). The top three zip codes for daily freight deliveries and shipments are located in midtown Manhattan next to the Lincoln Tunnel. Id. That freight includes medical supplies, clothing, food, water, school supplies, hospitality supplies, home and commercial heating oil, and more essential goods. Id. Trucks and other commercial vehicles deliver nearly all of that freight. Id. TANY anticipates that the amount of freight tonnage moved into or out of Manhattan each year by its members will substantially increase over the next twenty (20) years. Id. Freight tonnage is projected

to grow by 68 percent by 2045 in New York City. Id. Vitally important service industries, like moving, plumbing, electrical, and general maintenance services, rely on the trucking industry. Id.

On a given day, many of the trucks delivering essential freight and providing vital services travel into and throughout the Zone, and are forced to subsequently reenter the Zone multiple times per day, to abide by their customers' strict delivery instructions. (A-29). TANY members have no alternative means of operating their businesses and making deliveries in Manhattan other than to subject their fleets to charges imposed by the Tolling Program. Id.

Each facet of the Tolling Program adversely targets TANY members, from the boundaries of the Zone, to the pricing disparity among motor vehicles, even down to the frequency of Tolling Program charges imposed upon TANY members. (A-30). The Tolling Program is designed such that trucks will be charged per entry into the Zone, with no exceptions. Id.

MTA touts the Tolling Program's off-peak pricing as a concession to the freight industry. Id. However, this "concession" provides virtually no benefit to TANY members. Id. The Tolling Program's off-peak pricing model purports to charge a reduced toll price to commercial vehicles while keeping in place multiple charges per entry (and re-entry) into the Zone. Id. In reality, the off-peak pricing model is largely unusable for the freight industry due to factors beyond the industry's control. Id.

TANY has been a long-time supporter of New York City's Off Hours Delivery Program, which provides financial incentives to those businesses that are able to implement it. (A-30). However, TANY trucks must make their deliveries in the Zone based upon customer requirements and logistical constraints which do not permit a switch to off-peak hours, as MTA has simplistically asserted. Id. For example, customers in the Zone operate under strict freight elevator rules and typically employ a unionized workforce, making any shift to deliveries during off-peak hours impossible. Id. Residential buildings restrict daily delivery access to between 8:30 AM and 4:00 PM, construction sites do not operate during overnight hours, and few businesses will accept deliveries overnight. Id.

An additional consideration arises in the event that some of a motor carrier's customers elect to take advantage of the Off Hours Delivery funding, but not all of their customers make the switch. (A-30-31). Under that scenario, the result would likely be additional truck trips. (A-31). Whereas now that carrier can route a single truck throughout the course of the day, if not all of the carrier's customers take advantage of the Off Hour Delivery Program, the carrier would then likely need one truck for daytime deliveries, and a second truck for nighttime deliveries. Id. Alternatively, if only one of a motor carrier's customers is able to switch to Off Hours Delivery, the carrier may be forced to alter its services and not deliver to that customer at all, as it may not be feasible to send a truck in overnight to service one location. Id.

Similarly, the Tolling Program's off-peak pricing "concession" will have little to no effect on TANY members' delivery schedules. (A-31). TANY members already strive to complete their deliveries in an efficient and cost-effective manner. Id. A truck located north of the Zone on the East Side of Manhattan and heading to Queens or Brooklyn will use the Queensboro Bridge as the most efficient crossing. Id. Access to the Queensboro Bridge is on either 59th Street or 58th Street, both of which are located in the Zone. Id. This means that a truck heading from the East Side of Manhattan to Queens or Brooklyn is charged under the Tolling Program for simply accessing either the 59th Street or 58th Street entrance to the Queensboro Bridge. Id.

Similarly, a truck located north of the Zone, heading south on the West Side of Manhattan, is charged under the Tolling Program to simply access Route 9A (which is exempt from the congestion pricing toll) at 59th Street as trucks are prohibited on 9A north of 59th Street. Id.

These examples illustrate the most efficient routes available to trucks operating in Manhattan to minimize time, miles traveled, and fuel use. (A-32). Yet, despite already employing the most efficient routes under these examples, TANY Members are left with no choice but to incur charges under the Tolling Program. Id. Traveling north to cross the George Washington Bridge to avoid one of the multiple per-day charges under the Tolling Program requires TANY members to operate their trucks for increased lengths of time and distance, shifting traffic to other burdened areas of New York City,

burning more fuel and creating more unwanted emissions, and potentially creating hurdles to complying with Federally mandated hours-of-service requirements. Id.

The trucking industry and truck operators support every segment of the economy in Manhattan. Id. MTA expects TANY members to pass along the cost of the new toll to their customers. Id. Customers in the Zone, like restaurants, hospitals, and schools, frequently receive multiple deliveries per day. Id. It is conceivable that one customer in the Zone will absorb Tolling Program charges four (4) separate times in one day. Id.

For example, one trucking company may deliver produce, a second trucking company may deliver meat, a third trucking company may deliver beverages, and a fourth trucking company may deliver linens to a single business. (A-32). These additional charges, compounded, will have a significant economic effect on the tens of thousands of businesses located in the Zone, especially the vast number of small grocers and eateries that rely on the trucking industry to operate their businesses. Id.

Implementation of the Tolling Program disproportionately targets TANY members with both the intention and the anticipated effect of changing their routes, rates and services. (A-33).

Moreover, the Tolling Program imposes a massive administrative burden on the trucking industry, requiring TANY members to review multiple daily trips across varying toll rates, apply complex credit structures, and navigate billing errors through a

web of rental, lease, and operating agreements standard among the trucking industry's freight operations. Id.

## ARGUMENT

## STANDARD OF REVIEW

On a 12(b)(6) motion, all factual allegations in the Complaint must be accepted as true and all reasonable inferences must be drawn in the plaintiff's favor. *See*, *e.g.*, L-7 Designs v. Old Navy, LLC, 647 F.3d 419, 429-430 (2d Cir. 2011); Sacerdote v. New York Univ., 9 F.4th 95, 106-07 (2d Cir. 2021) ("In assessing the complaint, we must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor."). A defendant can only succeed on a 12(b)(6) motion if the Complaint fails to state a claim for relief that is plausible on its face. Id. Determining whether a claim for relief is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. To meet the plausibility requirement, the Complaint must assert enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting the claim. *See* Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007).

In deciding a 12(b)(6) motion, the Court should not only consider the allegations in the Complaint, but also "documents incorporated by reference and 'matters of which judicial notice may be taken.'" Georges v. Detroit Pizza NYC LLC, 2024 U.S.Dist.

LEXIS 51634, *6 (S.D.N.Y. March 20, 2024) (Liman, J.) *quoting* Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## POINT I

## CONGESTION PRICING VIOLATES THE DORMANT COMMERCE CLAUSE BECAUSE THE HEAVY TOLL BURDEN ON COMMERCIAL TRUCKS IS NOT A FAIR APPROXIMATION OF USE

The Commerce Clause of the United States Constitution gives Congress the power to regulate Commerce "among the several States." U.S Const. Art. I, Sec. 8, Cl. 3. "The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." GMC v. Tracy, 519 U.S. 278, 287 (1997).

The Commerce Clause "represented the framers' reaction to overreaching by the individual states that might jeopardize the growth of the nation – and in particular, the national infrastructure of communications and trade – as a whole." American Liberties Ass'n v. Pataki, 969 F.Supp. 160, 169 (S.D.N.Y. 1997).

"A litigant can wield the dormant Commerce Clause to attack the propriety of a 'user fee', i.e. a charge assessed for the use of a government facility or service." Industria Y Distribution de Alimentos v. Suarez & Co., 797 F.3d 141, 145 (1st Cir. 2015). Courts have developed a three-pronged test for evaluating the constitutionality

of user fees such as the one at issue here, known as the "Evansville" Test. *See* Northwest Airlines, Inc. v. Cty. of Kent, 510 U.S. 355, 369 (1994) *citing* Evansville-Vanderburgh v. Delta Airlines, Inc., 405 U.S. 707 (1972).

A toll must satisfy three requirements to pass the "Evansville" Test: (1) it must be a fair approximation of use; (2) it must not be excessive in relation to the benefits conferred; and (3) it must not discriminate against interstate commerce. *See* Selevan v. New York Thruway Auth., 711 F.3d 253, 259 (2d Cir. 2012) *citing* Northwest Airlines, Inc. v. Cty. of Kent, 510 U.S. 355, 369 (1994). If any one of these "Evansville" requirements is not met, the toll is unconstitutional.

As alleged in TANY's Amended Complaint, the Tolling Program does not meet the first "Evansville" requirement. (A-39-43) The "fair approximation" test requires "rational distinctions among different classes of motorists" to ensure that each user is paying a fair share for its use. Selevan at 260. The critical question is "whether the government is charging each individual entity a fee that is reasonably proportional to the entity's use, and whether the government has reasonably drawn a line between those it is charging and those it is not." Industria, *supra*, at 145.

The fair approximation prong of the "Evansville" test is necessarily fact-specific. Indeed, reasonableness – as the fair approximation prong requires – is the quintessential question of fact. *See*, *e.g.* Simon Prop. Group, L.P. v. Lumbermen's Mut. Cas. Co., 459 Fed. Appx. 16, 18 (2d Cir. 2012) (reasonableness of delayed notice of claim to insurer

"is generally a question of fact"); Jones v. Treubig, 963 F.3d 214, 231 (2d Cir. 2020) ("the reasonableness of an officer's perception of the facts . . . is the province of the jury"); Lavender v. Manheim's PA. Auction Servs., 399 Fed. Appx. 649, 653 (2d Cir. 2010 (whether creditor reasonably relied on debtor's financial statement "requires the fact finder to consider the totality of the circumstances"); Loomis Sayles Trust Co., LLC v. Citigroup Glob. Mkts., Inc., 2024 U.S. Dist. LEXIS 175526, *13 (S.D.N.Y. Sept. 26, 2024) (Schofield, J.) ("Reasonableness determinations are quintessential jury issues").

Here, TANY asserted in its Amended Complaint that trucks make up only 4% of vehicle traffic in the Zone. (A-23, ¶ 13). This statistic is contained within the TMRB report, which was incorporated by reference in TANY's Amended Complaint, and has never been disputed by MTA. (A-27, ¶ 42; A-41, ¶ 137). TANY further asserted in its Amended Complaint that the Tolling Program is not reasonably or rationally structured in a manner that will reduce congestion, which is the Program's statutory mandate. (A-40-43; ¶¶ 130-151). This is because the Tolling Program overcharges trucks, which are not a meaningful part of the traffic problem in the Zone (4%), while giving the real culprits – Taxis and For-Hire Vehicles (52%) and passenger vehicles and motorcycles (35%) either full or partial exemptions. (A-40, ¶¶ 130, 135).

To put a finer point on it, in total, Taxis, For-Hire Vehicles, passenger vehicles and motorcycles make up 87% of all traffic in the Zone, and commercial trucks make up 4%. (A-40, ¶¶ 130, 135). Yet, the price structure of the Tolling Program targets

trucks as if they are the main problem. Not only are they charged 1.6 to 2.4 times the amount that passenger vehicles are charged, but TANY trucks also must incur this outsized charge each and every time they enter the Zone, while passenger vehicles are charged no more than once per day. Meanwhile, Taxis and For-Hire Vehicles pay nothing for entry into the Zone, and instead their customers pay a fractional charge (approximately 3-10% of the truck charge) for trips to, from, within or through the Zone. (A-27). As such, the truck toll is not only different in degree, but also vastly different in kind than the tolls charged to nearly all other classes of vehicles.

Further, while the stated intention of the Tolling Program is to alter the choices that vehicle drivers make with respect to their routes, and the timing of those routes, for the purpose of reducing traffic in Midtown Manhattan, commercial trucks have the least ability to make those changes. As alleged in the Amended Complaint, TANY trucks are usually required to make their deliveries where and when their customers require. (A-41, ¶¶ 137-138). For example, if a doctor's office in Midtown Manhattan needs latex gloves by tomorrow, a truck driver cannot hold that delivery until next week to combine it with another trip into the Zone. Practically speaking, the Tolling Program cannot dissuade trucks from entering the Zone when they must – indeed, the entire infrastructure of New York City depends on trucks continuing to enter the Zone multiple times per day, to meet their customers' needs. Id.

Therefore, it is plain that the hefty charges to commercial trucks under the Tolling Program are not reasonably or rationally aimed at reducing congestion, but rather are an effort to use TANY trucks as MTA's cash cow.

The district court ignored the statistics contained in MTA's own study (87% vs. 4%) and instead adopted MTA's bare assertion that trucks impose a "greater use of New York's Transportation infrastructure and contribution to deleterious environmental outcomes" to justify the disproportionately heavy toll burden imposed on commercial trucks. (A-53). This was error. The dormant Commerce Clause requires that tolls fairly approximate use. Therefore, in the case of the Tolling Program, which is a congestion pricing program, "use" must mean "traffic congestion." Indeed, MTA conducted research and compiled data regarding the different classes of vehicles and their responsibility for traffic congestion in the Zone. TANY relied on that data in its Amended Complaint. Meanwhile, MTA and the district court relied on a single, conclusory sentence in the TMRB Report stating that "trucks have an outsized impact on congestion" to support the argument that trucks deserve to shoulder a heavier toll burden. (A-52). But there is no evidence (statistical or otherwise) in the TMRB Report, nor anywhere else in this record, to substantiate that claim.

Moreover, even if this unsupported statement were true, it does not necessarily stand to reason that trucks have such an enormously outsized impact on congestion to overcome the fact that they make up only 4% of actual traffic in the Zone. Nonetheless,

one would assume that if trucks' "outsized impact on congestion" were significant enough to make trucks – at 4% of vehicle traffic – the actual primary culprit of traffic congestion in the Zone such that it justified charging them as such, MTA would have included those statistics in the TMRB Report, or provided some other proof of that claim to the court below. Instead, however, MTA simply asked the district court to accept as gospel a single, conclusory sentence contained within the TMRB Report and ignore the actual statistics contained therein, which calculates truck traffic in the Zone at only 4%.

The district court, in ratifying MTA's argument in this regard, applied the Rule 12(b)(6) standard backwards. It is the Plaintiff's and not the Defendant's factual assertions that should be accepted as true for purposes of evaluating the sufficiency of a Complaint. Here, TANY asserted in its Amended Complaint that commercial trucks are not a meaningful cause of traffic congestion in the Zone, and supported that assertion with citation to MTA's own traffic studies contained within the TMRB Report. (A-27; A-40-41). It was reversible error for the district court to ignore TANY's assertion of fact and instead adopt MTA's baseless assertion to the contrary.

The district court also incorrectly held that because trucks are louder and cause more pollution than other types of vehicles, the heavier toll burden on commercial trucks is justified. (A-52). This determination misses the mark because MTA's only legislative mandates in being tasked with developing the Tolling Program were to reduce congestion in the Zone and to raise money. Whether trucks cause more pollution

than other types of vehicles is wholly irrelevant. By tolling trucks most heavily despite MTA's own statistics showing that trucks are a miniscule cause of traffic congestion in the Zone is simply not a fair approximation of use. Rather, it is a classic "overreach" that the Commerce Clause is designed to prohibit. *See* American Liberties Ass'n, *supra* at 169.

For these reasons, the district court erred in dismissing TANY's Commerce Clause claim.

## POINT II

## CONGESTION PRICING IS PREEMPTED BY FAAAA BECAUSE IT RELATES TO THE PRICES, ROUTES, AND SERVICES OF MOTOR CARRIERS

The Tolling Program is preempted by federal law because it has both the intent and the effect of significantly impacting the prices, routes and services of motor carriers, in direct contravention of the Federal Aviation Administration Authorization Act ("FAAAA").

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000); Art. VI, Cl. 2. Pursuant to this power under the Supremacy Clause, the FAAAA expressly preempts any state "law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C.S. Sec. 14501(c)(1). Congress's intent in

enacting the FAAAA was to "ensure transportation rates, routes and services" reflected "maximum reliance on competitive market forces," Kloppel v. Sears Holding Corp., 2018 U.S. Dist. LEXIS 33606 (W.D.N.Y. Feb. 28, 2018), and "to create a completely level playing field" for motor carriers. NYS Motor Truck Ass'n v. Pataki, 2004 U.S. Dist. LEXIS 25519 (S.D.N.Y. Dec. 16, 2004). The United States Supreme Court has reaffirmed multiple times that "related to" has its ordinary definition of "having connection with or reference to," which gives the FAAAA an extraordinarily broad preemptive scope. See, e.g., Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. 364, 367 (2008). While the language of a given measure is often determinative, the FAAAA also preempts state measures that have a "significant effect" on rates, routes, and services of motor carriers. Id. Only state laws with a "tenuous, remote or peripheral" effect on carriers' rates, routes, or services are not preempted. Id.

FAAAA preemption is broad in scope. If a law merely "relates to" or has a "connection with," or significantly affects, motor carriers' prices, routes or services, the law is preempted. *See* Nw., Inc. v. Ginsberg, 572 U.S. 273, 284, 288 (2014). If, as here, "the effect of [a] regulation is that carriers will have to offer [rates, routes, or services] that differ significantly from those that, in the absence of the regulation, the market might dictate," the state law is preempted. Rowe, *supra* at 372.

In its Amended Complaint, TANY alleged that the Tolling Program, by both its intent and its effect, significantly impacts carriers' prices, routes, and services. (A-30,

¶¶ 64-67; A-32, ¶¶ 82-87; A-44, ¶¶ 162-164). Specifically, as alleged, the TRMB Report expressly states that charging lower toll rates during overnight hours may help incentivize truck drivers to shift their routes to enter the Zone at night rather than during peak periods. (A-27, ¶ 44). The Report also states that the Tolling Program's extreme charges for trucks are based, in part, on the need to encourage the "optimization of deliveries" to reduce trucks' contribution to congestion in the Zone (i.e., to reroute trucks so that they make fewer trips into the Zone). (A-27, ¶ 45; A-44, ¶¶ 162-163).

The intent of the Tolling Program to interfere with motor carriers' routes and services, standing alone, is sufficient to state a plausible claim for relief under FAAAA. In addition, the Program's impact on routes and services also affects carriers' prices. *See* Fed. Exp. Corp. v. California Pub. Utilities Comm'n, 936 F.2d 1075, 1078 (9th Cir. 1991) ("Terms of service determine cost. To regulate them is to affect the price. The terms of service are as much protected from state intrusion as are the air carrier's rates."). As alleged in the Amended Complaint, in many cases motor carriers have no choice but to meet their customers' delivery schedules, which require them to enter the Zone and pay the toll, sometimes multiple times per day. (A-30-31, ¶¶ 70-73; A-44, ¶¶ 165-166). In the aggregate, this forces motor carriers to either renegotiate their contracts with their customers or absorb the significant costs themselves, which then has other adverse consequences on their businesses. (A-44, ¶ 166).

Many smaller motor carriers will be forced out of business by this Hobson's choice. The fee structure of the Tolling Program is designed with the stated intent to alter the routes and services of motor carriers, (A-44, ¶ 164, n. 8), and is also, in practice, having a significant effect on carriers' prices. This is not permissible under FAAAA.

In finding that the Tolling Program was not preempted by FAAAA, the district court noted that the toll applies generally and not just to motor carriers. (A-55). But this is not dispositive. *See*, *e.g.*, Bedoya v. Am. Eagle Express, 914 F.3d 812, 821 (3d Cir. 2019). Regardless, the MTA expressly targeted the trucking industry in the TMRB Report, which was the foundational document for developing the toll structure. The TMRB Report overtly stated that charging lower rates during overnight hours may help to incentivize truck drivers to shift their hours of travel into the Zone to less congested times. (A-27, ¶ 44). The MTA also overtly stated that the charges for trucks were based, in part, on the need to encourage the "optimization of deliveries" to reduce trucks' contribution to congestion in the Zone. (A-27, ¶ 45). As such, for the district court to hold that the Tolling Program does not target the trucking industry is to turn a blind eye to the evidence in the record. In fact, the Tolling Program directly contravenes the purpose of FAAAA, which is to ensure that motor carriers can operate on a "completely level playing field" with "maximum reliance on competitive market forces." *See* Kloppel, *supra*.

The district court also held that the Tolling Program is not preempted by FAAAA because it does not *require* motor carriers to change their rates, routes or services. (A-56). This is incorrect on both the facts and the law. To begin with, TANY addressed the heavy administrative burden imposed by the Tolling Program in its Amended Complaint. (A-33, ¶ 88). For example, the Tolling Program is forcing motor carriers to alter their billing systems, renegotiate contracts, and correct daily billing errors. *See* (A-33, ¶ 88; A-44 ¶¶ 164-168). It is completely changing how their businesses run. While the Tolling Program does not "require", *per se*, motor carriers to change anything, it certainly puts them in a situation where the sustainability of their business requires them to make these changes. If States could circumvent FAAAA preemption by passing laws that suffocate motor carriers' ability to do business while stopping short of expressly controlling how their businesses' run, FAAAA preemption would lose all of its teeth.

The district court further held that the Tolling Program is not preempted by FAAAA because it is not aimed at the customer-carrier relationship. (A-55). This is yet another way of saying that the Tolling Program's effect on motor carriers' rates, routes and services is merely incidental. But again, the express intent of the MTA cannot be ignored when determining the Tolling Program's aims. The TMRB Report states in no uncertain terms that the MTA intends for the Tolling Program to change the routes and service times of commercial trucks. For the district court to hold that such

changes are merely incidental, as opposed to a central and intended mechanism of Congestion Pricing, cannot be squared with the evidence in the record.

The district court also held that the Tolling Program "does not impermissibly threaten a 'patchwork of service-determining laws, rules, and regulations' that requires motor carriers to alter their conduct as they move from jurisdiction to jurisdiction." (A-56). But a toll with the stated intent of keeping motor carriers out of a certain area at certain times is exactly the type of jurisdiction-specific constraint that FAAAA preemption is designed to prevent. This is especially true where, as here, the area in question is the main financial district of the nation's economic hub, and the times in question are weekday business hours. Imagine, for example, that other municipalities throughout America pass congestion pricing tolls with the stated intention of changing the routes and delivery times of commercial trucks in a manner that meets their jurisdiction-specific needs. This would create an impermissible patchwork of local measures which, in the aggregate, could bring the trucking industry to a grinding halt. FAAAA preemption is designed to prohibit this exact result.

Lastly, the district court held that the Tolling Program is not subject to FAAAA due to a statutory exemption for "the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle . . . ." (A-56, n. 4). But that is *not* how the Tolling Program operates or intends to regulate traffic in the Zone.

First, the purported purpose of the Tolling Program is to reduce congestion in the Central Business District -- not to prevent vehicles of certain weights and sizes from entering. Indeed, the TMRB Report noted the percentage of Zone traffic each class of vehicle made up, and said nothing about their weights and sizes. Second, there is no evidence in the record to support the district court's holding that the classification of commercial trucks and similar sized vehicles under the Tolling Program is based upon the "size or weight of the motor vehicle." Indeed, transit buses of at least the same size and weight of many delivery trucks are completely exempt from the Tolling Program. It should go without saying that if the vehicle classifications under the Tolling Program were "based on the size or weight of the motor vehicle", buses would not be fully exempt while delivery trucks bear the heaviest burden. *See* *Colorado Motor Carriers Ass'n v. Town of Vail*, No. 123CV02752CNSSTV, 2023 WL 8702074, at *10 (D. Colo. Dec. 15, 2023) ("[N]o one on behalf of the Town has explained why it is unacceptably risky for [certain] trucks to operate in the Pedestrian Mall Areas, while other motor vehicles of similar types and sizes—such as public transportation buses, armored money vehicles, and waste and recycling collection trucks, do not pose such risks and remain free to drive through those areas.)" (internal citation omitted).

The Program is *not* a measure to limit or control routes based on weight or size. That is simply not how the Program operates on its face, or what the State expressly

intended in planning to implement it. As such, the FAAAA preempts the Tolling Program.

## POINT III

## THE DISTRICT COURT APPLIED THE WRONG STANDARD OF REVIEW FOR A RULE 12(b)(6) MOTION, MISTAKENLY REQUIRING TANY TO SUPPORT ITS CLAIMS WITH EVIDENCE DESPITE NO DISCOVERY HAVING BEEN CONDUCTED

Underpinning the entirety of the district court's decision dismissing TANY's Amended Complaint was the application of a review standard that was far too rigorous for a Rule 12(b)(6) motion. In its decision, the district court repeatedly faulted TANY for failing to support its legal claims with evidence, despite the fact that MTA made a pre-answer motion to dismiss prior to any discovery having been conducted. (A-52; A-53). In so doing, the district court applied a standard of review much closer to a Rule 56 standard, which was error.

On a 12(b)(6) motion, the question is whether the complaint contains sufficient facts which, accepted as true, state a plausible claim for relief. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007). The question is not whether the Plaintiff can already substantiate those allegations with evidence. The "plausibility" standard requires a Plaintiff to allege facts which permit a reasonable inference that the claims can be proven at trial. It does not impose an evidentiary burden on the Plaintiff. *See* Matson v. Bd. of Educ. of the City Sch. Dist. of NY, 631 F.3d 57 (2d Cir. 2011). A

district court's granting of a 12(b)(6) motion should only be affirmed "if it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." Id.

Here, with respect to both of TANY's legal claims, the district court incorrectly required TANY to provide evidence to support its claims. This was error.

First, with respect to its dormant Commerce Clause claim, TANY alleged in its Amended Complaint that commercial trucks make up only 4% of vehicle traffic in the Zone. This statistic came from the MTA's own traffic study contained within the TMRB Report, which was incorporated by reference into TANY's Amended Complaint. In light of this, TANY asserted in its Amended Complaint that charging trucks much more heavily and much more frequently than passenger vehicles is not a fair approximation of use for a tolling program with the statutory goal of reducing traffic congestion. (A-40-43; ¶¶ 130-151).

In the decision below, the district court improperly credited MTA's bare assertion regarding the "outsized impact" that trucks purportedly have on congestion and held that TANY did not "offer any evidence disputing that finding." (A-52). But there is no requirement on a Rule 12(b)(6) motion that TANY provide evidence to dispute the baseless assertions of MTA. Rather, the facts alleged by TANY, which were premised upon MTA's own traffic studies contained within the TMRB Report, were that trucks

make up a *de minimis* amount of vehicle traffic in the Zone, so it is not a fair approximation of use to charge them as if they are the primary cause of the congestion problem in Midtown Manhattan. If accepted as true, which it must be for purposes of a Rule 12(b)(6) motion, TANY has presented a plausible fair approximation claim. It was wrong for the district court to require TANY at this early stage of the litigation to "offer evidence" to "dispute" MTA's assertions.

Similarly, the district court held that TANY had provided no "evidence that the TMRB's findings are so inaccurate as to provide a wholly unreasonable basis for the differential toll rates." (A-53). Again, it is not incumbent upon TANY at the pleadings stage of the litigation to provide the Court with evidence to support its claims. Rather, it must only assert factual allegations which, if proven, will support its claim. TANY's Amended Complaint easily clears this low bar. The fact that commercial trucks make up only 4% of vehicle traffic in the Zone is sufficient, standing alone, to assert a plausible fair approximation claim. TANY does not yet know how the MTA arrived at its toll structure, as no discovery has been conducted, but on its face, it is wholly unreasonable to charge the biggest congestion culprits (passenger vehicles) the least while charging the smallest players (trucks) the most. The MTA might ultimately prove, as it has baselessly alleged, that the "turning radii" of trucks somehow make them primarily responsible for traffic congestion, despite its own data showing that they comprise only 4% of traffic in the Zone. But that is not an assertion that TANY needs

to rebuke with evidence on a Rule 12(b)(6) motion. It was error for the district court to hold otherwise.

Similarly, with respect to TANY's FAAAA claim, the district court held that TANY "has not shown that the Tolling Program will have a significant impact on the prices, services, or routes of motor carriers." (A-55). Yet again, TANY was not required to, nor could it, make an evidentiary showing at the pleadings stage of this litigation. Rather, TANY was required to, and did, assert detailed factual allegations as to how the Tolling Program compels motor carriers to alter rates (to recover the toll), routes (to avoid or minimize it), and services (to adjust delivery times or frequency) in order to meet customer demands in Midtown Manhattan. The district court erred in holding that these allegations failed to assert a plausible claim for relief under FAAAA.

As this Court has noted, plausibility is a lower standard than probability. Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, 184 (2d Cir. 2012). The district court applied the wrong standard here, and reversal is warranted.

## CONCLUSION

Based on the foregoing, it is respectfully requested that the decision of the district court be reversed, with costs to the Plaintiff-Appellant.

DATED: June 8, 2026. MONACO COOPER LAMME & CARR, PLLC

/s/ Brian D. Carr
By: Brian D. Carr, Esq.
Jonathan E. Hansen, Esq.
*Attorneys for Trucking Association of New York*
Address: 1881 Western Avenue, Suite 200
Albany, New York 12203
Phone: (518) 855-3535
Email: bcarr@mclclaw.com
jhansen@mclclaw.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned counsel for Plaintiff-Appellant certifies that the foregoing Appellant's Brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 8,598 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word and is set in Garamond font in a size equivalent to 14 points or larger.

DATED: June 8, 2026.

MONACO COOPER LAMME & CARR, PLLC

/s/ Brian D. Carr
By: Brian D. Carr, Esq.