# 26-909

## United States Court of Appeals

*for the*

## Second Circuit

TRUCKING ASSOCIATION OF NEW YORK,

*Plaintiff-Appellant,*

– v. –

METROPOLITAN TRANSPORTATION AUTHORITY,
TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,

*Defendants-Appellees,*

LETITIA JAMES, in her capacity as Attorney General for the State of New York,

*Intervenor-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

# BRIEF FOR DEFENDANTS-APPELLEES

Mark A. Chertok
Elizabeth R. Knauer
SIVE, PAGET & RIESEL P.C.
560 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 421-2150

Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
Thomas A. Lloyd
KAPLAN MARTIN LLP
1133 Avenue of the Americas
Suite 1500
New York, New York 10036
(212) 316-9500

*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT....................1

BACKGROUND....................5

A. The Traffic Mobility Act....................5

B. The Adopted Toll Rate Schedule....................7

C. The Implementation of the Program....................11

D. Procedural History....................11

STANDARD OF REVIEW....................16

SUMMARY OF ARGUMENT....................17

ARGUMENT....................17

I. TANY Did Not Plausibly Allege a Violation of the Dormant Commerce Clause....................17

II. TANY Did Not Plausibly Allege a Violation of the F4A Preemption Clause....................26

A. The Scope of Preemption....................27

B. The F4A Does Not Apply to Tolling Programs....................29

C. The *Bedoya* Factors Weigh Against Preemption....................31

D. The Program Does Not "Target" Motor Carriers....................37

III. Even if the F4A Applied, the Program Is a Permissible Weight and Size Limitation....................38

IV. The District Court Applied the Correct Standard....................41

CONCLUSION....................42

## TABLE OF AUTHORITIES

**CASES** *Page(s)*

*Ace Auto Body & Towing, Ltd. v. City of N.Y.*,
171 F.3d 765 (2d Cir. 1999)....................29

*Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*,
613 F.3d 206 (D.C. Cir. 2010).................... 37, 38

*Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*,
886 F.3d 238 (2d Cir. 2018)....................20

*Am. Trucking Ass'n, Inc. v. R.I. Turnpike & Bridge Auth.*,
123 F.4th 27 (1st Cir. 2024).................... *passim*

*Angus Partners LLC v. Walder*,
52 F. Supp. 3d 546 (S.D.N.Y. 2014).................... 24, 26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................16

*Bedoya v. Am. Eagle Express Inc.*,
914 F.3d 812 (3d Cir. 2019).................... *passim*

*Brown v. N.Y.C. Transit Auth.*,
2024 WL 1347283 (S.D.N.Y. Mar. 29, 2024)....................6

*Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*,
519 U.S. 316 (1997)....................29

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)....................16

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
536 U.S. 424 (2002)....................36

*Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*,
791 F. Supp. 3d 433 (S.D.N.Y. 2025)....................20

*Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*,
No. 25-1963, ___ F.4th ___ (2d Cir. July 13, 2026) (slip op.) ..................... *passim*

*Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*,
906 F.3d 41 (2d Cir. 2018)............................................................. 27, 37

*Colo. Motor Carriers Ass'n v. Town of Vail*,
2023 WL 8702074 (D. Colo. Dec. 15, 2023) ..............................................4, 39

*Colo. Motor Carriers Ass'n v. Town of Vail*,
153 F.4th 1052 (10th Cir. 2025) ......................................................................4, 40

*Costello v. BeavEx, Inc.*,
810 F.3d 1045 (7th Cir. 2016)..............................................................................32

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013) ................................................................... 27, 28, 35

*Dilts v. Penske Logistics, LLC*,
769 F.3d 637 (9th Cir. 2014)................................................................. 30, 32, 33

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*,
405 U.S. 707 (1972) ............................................................................ *passim*

*Green Mountain R.R. Corp. v. Vermont*,
404 F.3d 638 (2d Cir. 2005)..............................................................................28

*In re Lavender*,
399 F. App' x 649 (2d Cir. 2010) ....................................................................21

*Janes v. Triborough Bridge & Tunnel Auth.*,
977 F. Supp. 2d 320 (S.D.N.Y. 2013)............................................... 18, 19, 24, 26

*Janes v. Triborough Bridge & Tunnel Auth.*,
774 F.3d 1052 (2d Cir. 2014)..............................................................................18

*Jones v. Hendrix*,
599 U.S. 465 (2023) ..........................................................................................31

*Jones v. Treubig*,
963 F.3d 214 (2d Cir. 2020)....................................................................................21

*Metro. Transp. Auth. v. Duffy*,
784 F. Supp. 3d 624 (S.D.N.Y. 2025)...............................................................11, 31

*Montgomery v. Caribe Transp. II, LLC*,
146 S. Ct. 1199 (2026)............................................................................................4, 39

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ............................................................................................. 28, 35

*Muto v. CBS Corp.*,
668 F.3d 53 (2d Cir. 2012)......................................................................................16

*N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y*,
850 F.3d 79 (2d Cir. 2017) ......................................................................................27

*Nw. Airlines, Inc. v. Cnty. of Kent*,
510 U.S. 355 (1994) ................................................................................... *passim*

*Nw., Inc. v. Ginsberg*,
572 U.S. 273 (2014) ..................................................................................................32

*Omya, Inc. v. Vermont*,
33 F. App'x 581 (2d Cir. 2002)...............................................................................30

*POM Wonderful LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014) ..................................................................................................31

*Rowe v. N.H. Motor Transp. Ass'n*,
552 U.S. 364 (2008) ............................................................................................. 28, 35

*S.C. Johnson & Son, Inc. v. Transp. Corp. of Am.*,
697 F.3d 544 (7th Cir. 2012)....................................................................................33

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
598 B.R. 102 (S.D.N.Y. 2019)................................................................................41

*Selevan v. N.Y. Thruway Auth.*,
711 F.3d 253 (2d Cir. 2013) .......... 18, 22

*Selevan v. N.Y. Thruway Auth.*,
584 F.3d 82 (2d Cir. 2009) .......... 17, 18

*Simon Prop. Grp., L.P. v. Lumbermen's Mut. Cas. Co.*,
459 F. App'x 16 (2d Cir. 2012) .......... 21

*Vizio, Inc. v. Klee*,
2016 WL 1305116 (D. Conn. Mar. 31, 2016) .......... 20

**STATUTES**

23 U.S.C. § 129 .......... 29

23 U.S.C. § 301 .......... 29

49 U.S.C. § 14501(c)(1) .......... 2, 28

49 U.S.C. § 14501(c)(2)(A) .......... 4, 38, 40

N.Y. Pub. Auth. L. § 553(12-a) .......... 6

N.Y. Pub. Auth. L. § 553-j .......... 6

N.Y. Pub. Auth. L. § 553-k .......... 7

N.Y. Tax Law § 606(jjj) .......... 11

N.Y. Veh. & Traf. Law § 1701 .......... 5, 24

N.Y. Veh. & Traf. Law § 1704(1) .......... 5

N.Y. Veh. & Traf. Law § 1704(2) .......... 6

N.Y. Veh. & Traf. Law § 1704-a(1) .......... 6

N.Y. Veh. & Traf. Law § 1706 .......... 24, 37

Pub. L. 105-178 § 1101 .......... 29

Pub. L. 105-178 § 1216 .......... 29

Pub. L. 105-178 § 4016 .......... 29

**OTHER AUTHORITIES**

CENTRAL BUSINESS DISTRICT (CBD) TOLLING PROGRAM ENVIRONMENTAL ASSESSMENT (Apr. 2023), https://www.mta.info/document/110751 .......... 7, 33

H.R. Conf. Rep. 103-677 (1994) .......... 30

ISTEA § 1012(b) .......... 29

TRAFFIC MOBILITY REVIEW BOARD REPORT (Nov. 2023), https://new.mta.info/document/127761 .......... *passim*

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY CENTRAL BUSINESS DISTRICT (CBD) TOLL SCHEDULE, https://new.mta.info/document/138931 (last visited July 13, 2026) .......... 7, 11

## PRELIMINARY STATEMENT

This appeal arises out of one of the many failed challenges to the Central Business District ("CBD") Tolling Program (the "Program"), also known as Congestion Pricing. In 2019, the New York State Legislature directed Defendant-Appellee Triborough Bridge and Tunnel Authority ("TBTA"), an affiliate of Defendant-Appellee the Metropolitan Transportation Authority ("MTA"), to establish the Program to reduce traffic congestion in the Manhattan CBD, ensure funding for a safe and efficient mass transit system, and protect public health and safety. Following years of study and public input, and based on the recommendations of the independent Traffic Mobility Review Board ("TMRB"), TBTA adopted a toll rate schedule designed to balance the Program's financial, environmental, and congestion-mitigating impacts and which, to that end, imposes different tolls for entering or driving in the CBD based on, *e.g.*, vehicle size and type.

Plaintiff-Appellant Trucking Association of New York ("TANY") is a "not-for-profit trade association" that purports to speak for "the interests of the trucking industry in New York State," even as it acknowledges that its "members represent a diverse class of motor carriers," A-23 ¶¶ 20-21,[1] namely, competitors in the industry. Throughout this case, despite being given multiple chances, TANY has struggled in

---

[1] Citations to "A-#" refer to the Appendix filed by Appellant TANY, ACMS No. 38.1. Citations to "SA-#" refer to the Supplemental Appendix filed by Defendants-Appellees MTA and TBTA.

vain to present a coherent or consistent theory as to how the Program allegedly violates the rights of New York "truckers" under the Dormant Commerce Clause of the Constitution or the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501(c)(1) ("F4A"). Ultimately, the district court (Liman, J.) dismissed TANY's Second Amended Complaint ("SAC"). The court's careful consideration and dismissal of TANY's claims should be affirmed.

*First*, TANY has failed to plausibly allege that the Program's tolls on truckers are not based on a "fair approximation" of truckers' use of the CBD under *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355, 363 (1994). That deferential, rational-basis standard asks only whether the tolls—and specifically the classifications they draw between trucks and other types of vehicles—are "wholly irrational." Indeed, in an opinion issued today in a separate challenge to the Program, this Court held that the Program satisfies the *Northwest Airlines* inquiry because "the toll is based on some fair approximation of use." *Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*, No. 25-1963, ___ F.4th ___ (2d Cir. July 13, 2026) (slip op.). And as the district court explained, it was clearly rational for TBTA to impose higher tolls on trucks than, say, passenger vehicles, given that trucks impact the CBD more in terms of the physical space they occupy, the congestion they cause, the length of time they are (often double) parked on the streets, and the pollutants they emit. The TMRB Report, which TANY expressly incorporated by reference in its SAC, cited

these factors as reasons for recommending higher tolls for trucks. TANY concedes that trucks have long been charged higher bridge and tunnel tolls, registration fees, fuel taxes, and highway-use taxes than smaller vehicles such as passenger cars because of trucks' greater "use" of the roads (none of which TANY takes issue with). The fact that trucks make up 4% of vehicles in the CBD is irrelevant to determining whether the toll amounts charged to *individual* trucks are reasonable, as compared to individual passenger cars. And TANY's newfound contention on appeal that the Program's revenue mainly comes from trucks is unpled, unfounded, implausible, and nonsensical.

*Second*, the Program's tolls on trucks are not preempted by the F4A because those tolls do not directly or significantly affect carriers' "rates, routes, or services." No toll has ever been invalidated under the F4A, for good reason. As the district court explained in applying the four-factor test commonly used by courts to assess F4A preemption, including in *Bedoya v. American Eagle Express, Inc.*, 914 F.3d 812, 823 (3d Cir. 2019), the tolls apply generally to the public, not motor carriers alone. They do not address carriers' relationships with their customers, namely, the "outputs" of "rates, routes, or services," but rather merely affect an "input" in terms of the cost of providing services. They do not "bind" carriers to any particular rate, route, or service, as TANY concedes in alleging that many carriers will not change their behavior. And the Congress that passed the F4A recognized that tolls do not

create the kind of impermissible patchwork of laws that threatens free-market competition by creating different, incompatible standards: to the contrary, tolls (which uniformly charge for use of the roads, even if at different rates), have existed in this country and have been imposed by its various states for centuries.

*Finally*, even if the F4A's preemption provision applied, the Program's tolls fall within a carveout that permits states "to impose highway route controls or limitations based on the size or weight of the motor vehicle." 49 U.S.C. § 14501(c)(2)(A). As the Supreme Court recently clarified, this provision authorizes states to regulate motor carriers for many reasons, "such as guarding against highway wear and tear." *Montgomery v. Caribe Transp. II, LLC*, 146 S. Ct. 1199, 1205 (2026). The differentials TANY complains about—the fact that the toll rates charge trucks (and buses) more than passenger vehicles, and charge trucks (and buses) per entry into the CBD—are undisputedly based on trucks' size and resulting outsized contribution to congestion and pollution. And tellingly, TANY fails to inform the Court that the *only* authority it cites on this point, *Colorado Motor Carriers Association v. Town of Vail*, No. 23 Civ. 2752, 2023 WL 8702074 (D. Colo. Dec. 15, 2023), was reversed in relevant part by the Tenth Circuit in 2025, *Colorado Motor Carriers Association v. Town of Vail*, 153 F.4th 1052 (10th Cir. 2025).

## BACKGROUND

### A. The Traffic Mobility Act

The New York State Legislature passed the Traffic Mobility Act in 2019 as the culmination of decades of effort to address New York City's status as one of the most congested cities in the world and the chronic need for additional funding for its public transportation network. N.Y. Veh. & Traf. Law § 1701 *et seq.* ("TMA"). The TMA's legislative findings state that traffic in New York City—which ranks "third worst among cities in the world"—is "crippling" and "a significant contributor to decreased air quality." *Id.* § 1701. The New York State Legislature further found that the underfunding of New York City's subway infrastructure has "a significant deleterious impact on the health, safety, and livelihood of commuters, tourists, [and] resident New Yorkers" as well as on "the economy of the state of New York," such that "a long-term and sustainable solution is necessary in order to ensure stable and reliable funding" for this "important mass transit asset." *Id.* Consequently, the Legislature declared that to ensure the "public health and safety of New York's residents," the creation of a congestion pricing program in the Manhattan CBD was "a matter of substantial state concern." *Id.*

The TMA directs TBTA to "establish the central business district tolling program," *id.* § 1704(1), grants TBTA the power "to establish and charge variable

tolls and fees for vehicles entering" the CBD,[2] and authorizes TBTA "to make rules and regulations for the establishment and collection of central business district tolls, fees, and other charges," *id.* § 1704-a(1); *see* N.Y. Pub. Auth. L. § 553(12-a). All of the Program's revenues, less the costs of its operations, are dedicated to "the central business district tolling capital lockbox fund" and must "fund fifteen billion dollars for capital projects for the 2020 to 2024 MTA capital program," with any excess dedicated to successor MTA capital programs. N.Y. Veh. & Traf. Law § 1704-a(1); *see* N.Y. Pub. Auth. L. § 553-j.

Following the passage of the TMA, TBTA, along with the New York City and State Departments of Transportation (collectively, the "Project Sponsors"), engaged in a multi-year environmental review process under the National Environmental Policy Act ("NEPA"). That process culminated in a 958-page (plus thousands of pages in appendices) final Environmental Assessment ("EA"), along with a Finding of No Significant Impact issued in June 2023. *See* A-31 ¶ 73 n.6.[3] Relevant here,

---

[2] The TMA defines the CBD as the geographic area of Manhattan south and inclusive of 60th Street, but not including the FDR Drive, the West Side Highway, the Battery Park underpass, and "any surface roadway portion of the Hugh L. Carey Tunnel connecting to West St." N.Y. Veh. & Traf. Law § 1704(2).

[3] The EA is referenced in, and integral to, the complaint. *See Brown v. N.Y.C. Transit Auth.*, 2024 WL 1347283, at *6 (S.D.N.Y. Mar. 29, 2024) (MTA reports incorporated by reference where claims stemmed from the investigation of potential wrongdoing by affiliate NYCTA). Also, the EA is subject to judicial notice because it is publicly available and its authenticity is not disputed. *Id.* at *5-6.

the EA observed (on the same page TANY cites in its Complaint, *id.*), that "congestion within Midtown impedes truck mobility during the day." EA 6-39.

### B. The Adopted Toll Rate Schedule

On November 30, 2023, the TMRB—an independent advisory body established by the TMA to assess potential toll structures and recommend one to TBTA (*see* N.Y. Pub. Auth. L. § 553-k)—issued its report recommending a toll rate structure for the Program. That report is expressly incorporated by reference into the Complaint. *See* A-48 n.1.[4] The TMRB relied on the EA's findings and analyses (among other sources) in designing the details of its recommendations. TMRB Rep. at 31. The TMRB sought to achieve the Program's congestion-reduction and revenue-raising aims, while "keeping the base toll as low as possible, avoiding unnecessary traffic diversions, [and] supporting equity goals and environmental justice." *Id.* at 7.

On November 18, 2024, TBTA adopted the toll rate schedule proposed by the TMRB, with the proposed toll rates to be "phased in" over six years. SA-134; Toll Rate Sched.[5] Under that schedule, nearly all vehicles are charged a toll upon entry

---

[4] The TMRB Report is available at: https://www.mta.info/document/127761.

[5] The Program's toll rate schedule, which is incorporated by and integral to TANY's complaint, *see supra* n.3, is available at: https://www.mta.info/document/138931.

to the CBD.[6] The peak-period E-ZPass entry toll rate charged for passenger vehicles is $9; and $4.50 for motorcycles.[7] Toll Rate Sched. Passenger vehicles and motorcycles are also entitled to a once-per-day cap on tolls. *Id.* In line with the Program's stated equity goals, the Program provides a 50% discounted rate to low-income drivers after their first ten trips in a calendar month. TMRB Rep. 26.

As is common with most tolls, the Program tolls larger vehicles more than smaller ones. Single-unit trucks, vans with modified bodies, and non-transit buses pay $14.40, while larger multi-unit trucks and licensed sightseeing buses pay $21.60. *Id.*; Toll Rate Sched. These rates reflect larger vehicles' "outsized" impact on congestion, stemming from "their large size and large turning radii, their parking patterns, and the noise and air pollution they cause." TMRB Rep. at 20. The peak-period toll on multi-unit trucks and licensed sightseeing buses is roughly 2.4 times greater than the corresponding toll on passenger vehicles. This ratio is smaller than the ratio that exists under other major tolling programs in the New York metropolitan region (which often charge trucks even higher rates than those challenged here). *See id.*; A-26 ¶ 37.

---

[6] The only vehicle classes exempt from the Program are: (1) qualifying authorized emergency vehicles, (2) qualifying vehicles transporting persons with disabilities, (3) authorized commuter buses, and (4) specialized government vehicles. Toll Rate Sched.; *cf.* A-22 ¶ 6.

[7] The toll rates will increase proportionally for each vehicle category, once in 2028 and then again in 2031, as set forth in the toll rate schedule. *Id.*

The TMRB publicly explained its decision not to recommend even higher rates for trucks as follows:

> The recommended truck tolls balance the need to encourage the optimization of deliveries, thereby reducing trucks' contribution to congestion in the zone, with the equal need to minimize unnecessary diversions through communities that may already be burdened with comparatively high levels of air pollution and associated adverse health outcomes. Charging truck tolls at the rates they are typically charged at tolled facilities – often up to eight times the auto toll – could lead to unacceptable increases in truck diversions.

TMRB Rep. at 20. The reduction in traffic congestion that the Program was intended to bring substantially benefits truck drivers and their customers through reduced times to access the CBD and make deliveries in the CBD, and reduced parking demand, which reduces the need to incur tickets when parking illegally. EA 18A-1-2.

TANY makes several claims about the Program that misstate the Program's toll rate schedule. While TANY claims that the tolls charged to trucks are "different in kind" from all other vehicle classes, that is not accurate. Br. 22. The Program treats similarly-sized trucks and buses alike, grouping them together for purposes of the Toll Rate Structure. *See supra* at 8. And while TANY claims that trucks are the only vehicles that incur Program tolls "every time they enter the Zone," Br. 12, the reality is that approximately 65% of vehicles in the CBD (taxis, For-Hire Vehicles ("FHVs"), trucks, and buses) are subject to per-entry or per-trip charges. SA-50.

In its effort to paint trucks as "targets" of the Program, TANY has consistently alleged (across its various complaints) that taxis and FHVs are "fully exempt" from the Program tolls. Br. 12. But that is also not true. The toll rate applicable to taxis and FHVs is set on a per-trip basis, facilitating taxis and FHVs passing the toll on to their customers in accordance with existing New York City Taxi and Limousine Commission regulations, and is collected as a per-trip surcharge for all trips that originate in, pass through, or end in the CBD. *Id.* n.4. While TANY objects that this differential toll structure was never explained, in fact, the TMRB Report (which again, the SAC incorporated by reference) describes the reasons why this approach was chosen, including: (1) the "thousands of comments" received during "the EA process about the importance of not harming the taxi industry, which has been struggling since app-based FHVs"; (2) the fact that "Taxi and FHV drivers often enter the CBD without a passenger" to pass an entry toll onto; (3) concerns that a one-time charge "would impose an inequitable burden on either the driver, the first passenger, or both"; and (4) the observation that "ultimately, it is passengers – not drivers – who make the choice to add to vehicle congestion in the CBD" and therefore should pay the toll. TMRB Rep. at 22-23.[8]

[8] The toll rates imposed on taxis and FHVs were determined by dividing the once-daily toll rate for passenger vehicles by the average number of trips FHVs and taxis make in the CBD each day (6 and 12, respectively). TMRB Rep. at 22-23.

Finally, the Program has limited discounted rates, consistent with its aim of reducing congestion. For example, toll rates are reduced by 75% during overnight period hours when congestion is lowest. Toll Rate Sched. 1. The Program also provides tunnel crossing credits against the peak period toll for vehicles directly entering the CBD from tunnels that are already tolled—the Lincoln and Holland tunnels crossing under the Hudson River, and the Queens-Midtown and Hugh L. Carey tunnels crossing under the East River. Low-income drivers who live within the CBD are also eligible for an end-of-year tax credit for the tolls they have paid. TMRB Rep. at 28; N.Y. Tax Law § 606(jjj).

### C. The Implementation of the Program

After the courts, including the district court here, rejected numerous attempts to stop the Program, congestion pricing began on January 5, 2025. The Program has proven highly effective. "Traffic in the CBD has decreased substantially and commuter time and trip reliability have substantially improved." *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 697 (S.D.N.Y. 2025). "River crossing times improved," "[t]raffic speeds improved," and "[c]ommuters are saving as much as 21 minutes on their trips." *Id.*

### D. Procedural History

On May 30, 2024, TANY commenced suit by filing a complaint in the United States District Court for the Southern District of New York. A-5. TANY's suit was

the last-filed of six pre-implementation challenges to the Program in the Southern District of New York. Four of those challenges (including this suit) were marked as related and ultimately briefed in consolidated fashion (collectively, the "Related Actions").[9] TANY, like the plaintiffs in two other Related Actions (*Chan* and *Mulgrew*), alleged that the Program violates the Dormant Commerce Clause of the U.S. Constitution and the constitutional right to travel. SA-10-16. TANY also alleged that the Program violates the Supremacy Clause as to truckers because it is preempted by the F4A. A-27.

In late 2024, TANY (along with the plaintiffs in the Related Actions) moved to enjoin implementation of the Program. *Id.* at 51. Following a hearing and oral argument, at which the plaintiffs did not present evidence, the district court denied all four motions for a preliminary injunction. *Id.* In denying the motions, the court concluded that TANY had failed to establish a likelihood of success on the merits "for any claim." SA-118.

With respect to the Dormant Commerce Clause claims, the district court observed that the "fair approximation of use" standard under *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355 (1994), is "lenient," requiring only that the fee not

---

[9] The actions marked related to this one were: *Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365 ("*Chan*"), *Mulgrew v. U.S. Dep't of Transp.*, No. 24 Civ. 1644 ("*Mulgrew*"), and *New Yorkers Against Congestion Pricing Tax v. U.S. Dep't of Transp.*, No. 24 Civ. 376 ("*NYACPT*").

be "wholly unreasonable." SA-46 (citing *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 718 (1972)). Under that deferential standard, the Program "readily" passed constitutional scrutiny, given that there were "rational reasons" for distinctions drawn between different classes of vehicles, including (as the TMRB Report observed) trucks' outsized impact on congestion caused by their large size. SA-48. Similarly, the court reasoned that the Program's imposition of tolls on trucks per-entry rather than once per-day was rational because "a truck that enters the CBD multiple times per day contributes to congestion more than one that does not." SA-49.

The district court similarly concluded that TANY had failed to show a likelihood of success on the merits of its preemption claim. The court began with an analysis of the statute's legislative history, including evidence that "Congress did not intend to preempt" state toll roads. SA-75 (noting the House Conference Report that accompanied the F4A identified at least seven states which levied highway tolls but were classified as not regulating "intrastate prices, routes and services of motor carriers"). The court then applied the relevant factors identified in *Bedoya v. American Eagle Express Inc.*, 914 F.3d 812, 823 (3d Cir. 2019), and concluded that the Program's tolls are not preempted because they: (1) apply to all businesses and do not focus on motor carriers; (2) do not address carriers' relationship with customers; (3) do not bind the carrier to provide a particular price, route or service;

and (4) do not risk creating a "patchwork" of service-determining laws. SA-78-88. Finally, the court noted that even if the F4A *could* preempt the Program, the tolls would likely fall under the statute's exception for "size and weight" regulations. SA-88-9.

The MTA Defendants subsequently moved to dismiss the complaints in the four related actions, and on April 17, 2025, the district court granted the motion as to TANY with leave to amend. SA-216-17. The court acknowledged that in its prior opinion denying the request for a preliminary injunction, it had "made certain references to the factual record" to determine the F4A did not apply (as it could when considering that motion), but reasoned that "the legal conclusion that the [F4A] does not preempt the Tolling Program stands independently." SA-143-44. The court then reaffirmed that when looking only to the structure of the Program "as alleged" and "judicially noticeable materials," TANY "alleges nothing about the Tolling Program . . . that could permit a different outcome." SA-144. As for "fair approximation," the court similarly observed that "TANY does not advance any factual allegations that would support a conclusion that [the] distinctions between passenger cars and trucks are wholly unreasonable." SA-161-62.[10]

---

[10] TANY abandoned its claim that the Program violated the constitutional right to travel. SA-143. The district court also dismissed TANY's arguments that the Program's tolls are "excessive" under the *Northwest Airlines* test, which TANY does not raise in this appeal. SA-45.

The district court dismissed TANY's SAC in a Decision on March 10, 2026. The court explained that TANY had added "few new allegations," all of which were either already "contained in the TMRB report" and the Toll Rate Schedule, or entirely irrelevant to TANY's claims.[11] A-58. Accordingly, "without new relevant factual allegations, any intervening change in law, or any other showing of clear error" the court applied the law of the case doctrine, "incorporate[d] the legal conclusions it reached in [its earlier decisions]," and granted the MTA Defendants' renewed motion to dismiss TANY's complaint. A-66.

The two other challenges to the Program filed in the Southern District were marked as related to each other and proceeded separately. The district court (Seibel, J.) in those actions granted the MTA Defendants' motions to dismiss and that decision was affirmed on appeal earlier today by this Court. *See Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*, No. 25-1963, ___ F.4th ___ (2d Cir. July 13, 2026) (slip op.). This Court held that the challengers in those actions failed to plausibly allege that the Program violates the right to travel, applying the *Northwest Airlines* test which also governs TANY's Dormant Commerce Clause claim here. *Id.* at 13-15. As relevant here, the Court explained in *County of*

[11] The remaining "new" allegations concerned Governor Hochul's "pause" of the Program's implementation, and certain requests TANY had made under New York's Freedom of Information Law, which were already the subject of a state court action. A-59. None of those allegations are raised by TANY in this appeal.

*Rockland* that the Program "toll 'is based on some fair approximation of use of the facilities.'" *Id.* at 14 (quoting *Nw. Airlines*, 510 U.S. at 369). And because *Northwest Airlines* only requires "a fair, if imperfect approximation of use that reflect[s] rational distinctions" between motorists, the Program satisfies this deferential form of review because it "aims to benefit all toll payers by reducing traffic congestion in the CBD generally." *Id.* at 14-15.

## STANDARD OF REVIEW

This Court reviews "*de novo* a district court's grant of a motion to dismiss, accepting as true all factual allegations in the complaint and drawing all reasonable inferences in favor of the plaintiffs." *Muto v. CBS Corp.*, 668 F.3d 53, 56 (2d Cir. 2012). "[N]aked assertions" or conclusory statements are not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). In addition, the Court may consider documents "incorporated by reference" or "integral" to the complaint when reviewing a district court's decision granting a motion to dismiss. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

## SUMMARY OF ARGUMENT

Despite receiving multiple opportunities and the benefit of the district court's extensive analyses, TANY has failed to plead a viable constitutional or preemption claim. The Program's tolls readily satisfy the highly deferential "fair approximation of use" inquiry under the Dormant Commerce Clause because the tolls are not "wholly irrational." It is self-evident that individual trucks contribute more to congestion than individual smaller vehicles based on their size alone, and even if that were in question, TANY incorporated government findings to that effect into its SAC by reference. The F4A preemption claim fails because Congress did not intend for the F4A to preempt tolls on trucks, and TANY itself concedes that the Program tolls have had no effect on truck routes and services. Regardless, the tolls fall within the statutory exemption for "size and weight" limitations.

## ARGUMENT

### I. TANY Did Not Plausibly Allege a Violation of the Dormant Commerce Clause

Under *Northwest Airlines*, a toll will be upheld so long as it "(1) is based on some fair approximation of use of the [tolled] facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." 510 U.S. at 369. The three prongs of *Northwest Airlines* are not weighed equally: because TANY concedes that the Program does not discriminate against interstate commerce, the Program "will have a comparatively easier time

passing constitutional muster." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 94 (2d Cir. 2009) ("*Selevan I*").

TANY's only argument is that the Program's toll rates for trucks do not represent "a fair approximation" of their use of the CBD. But, as the district court observed, this claim is subject to a "lenient" standard, and the tolls must be upheld so long as they are not "wholly unreasonable." SA-46-47 (*quoting Evansville*, 405 U.S. at 718); *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 259 (2d Cir. 2013) ("*Selevan II*"); *Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320, 339 (S.D.N.Y. 2013) (fair approximation "does not require a perfect fit" between use of a road and a toll), *aff'd*, 774 F.3d 1052 (2d Cir. 2014) (per curiam). In other words, TANY's burden at this stage was to overcome a standard akin to rational basis review. *Selevan II*, 711 F.3d at 259 n.5 (2d Cir. 2013) (all that is required is a "rational basis" upon which to draw "distinctions among different classes of motorists"); *Selevan I*, 584 F.3d at 98 ("The *Northwest Airlines* test is not inflexible; it simply requires 'reasonableness.'"); *see also Cnty. of Rockland*, slip op. at 14.

Thus, under *Northwest Airlines*, tolling authorities may charge different rates to different classes of motorists so long as the different rates reflect "rational distinctions among different classes of motorists." *Selevan I*, 584 F.3d at 98 (internal quotation marks omitted). And although this Court has held that vehicles' relative "use" of a roadway may be one rational basis upon which to draw distinctions among

different classes of motorists, "it need not be the only one." *Selevan II*, 711 F.3d at 259 n.5 (citing *Evansville*, 405 U.S. at 712); *see also Am. Trucking Ass'ns, Inc. v. R.I. Turnpike & Bridge Auth.*, 123 F.4th 27, 47 (1st Cir. 2024) (noting "the Supreme Court has blessed a broad 'variety of measures of actual use'"). A tolling authority's core obligation in this context is merely to draw distinctions based on "reasonableness and broad proportionality." *Janes*, 977 F. Supp. 2d at 340.

The Program's toll rate structure fits comfortably within these broad parameters because the toll rates reflect rational distinctions based on relative contributions to congestion and the effects of congestion upon the public welfare. *See Cnty. of Rockland*, slip op. at 14 (holding that the Program satisfies *Northwest Airlines* because the congestion pricing "toll 'is based on some fair approximation of use'") (quoting *Nw. Airlines*, 510 U.S. at 369). A truck contributes more to congestion than a passenger vehicle does, and so the Program rationally charges trucks more than passenger vehicles to enter the CBD. The reasons for this are self-evident and were addressed in the TMRB Report: trucks are larger, take up more space on the road, and engage in more disruptive parking patterns than passenger vehicles. TMRB Rep. at 20; *see also Am. Trucking*, 123 F.4th at 49 ("At the most basic level, it does not strike us as wholly unreasonable to presume that bigger trucks will cause more damage to bridges, and smaller trucks, less."). These same factors also rationally distinguish trucks from taxis and FHVs, which, like passenger

vehicles, are smaller and emit fewer harmful pollutants, and do not contribute to congestion by double parking for long periods of time or making wide turns.

TANY offers a variety of arguments, which amount to nothing more than an improper invitation for the "courts to judge the wisdom, fairness, or logic of legislative choices." *Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*, 791 F. Supp. 3d 433, 452 (S.D.N.Y. 2025) (internal citation and quotation marks omitted), *aff'd*, No. 25-1963 (2d Cir. July 13, 2026) (slip op.).

First, TANY argues that "reasonableness" under the *Northwest Airlines* test is "fact-specific" and therefore categorically cannot be resolved on a motion to dismiss. Br. 20. That is not correct. Constitutional claims that involve "reasonableness," like any other, are subject to the basic pleading requirements of *Iqbal* and *Twombly*, SA-147-48, and there is ample precedent for resolving constitutional challenges to tolling programs on the pleadings. *See, e.g.*, *Cnty. of Rockland*, slip op. at 14-15 (affirming dismissal of constitutional challenge to the Program and holding that plaintiffs failed to adequately allege the Program violates the "fair approximation" prong of *Northwest Airlines*); *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 248 (2d Cir. 2018) (holding that the district court "correctly granted defendants' motion to dismiss" plaintiffs' dormant Commerce Clause claim); *Vizio, Inc. v. Klee*, 2016 WL 1305116, at *16 (D. Conn. Mar. 31, 2016) (granting motion

to dismiss where plaintiffs failed to plausibly allege that "the toll is not a fair approximation of use").

The cases cited by TANY are inapposite. Br. 20-21. They do not involve tolling programs or Dormant Commerce Clause claims, and selectively quote from discussions of unrelated procedural issues, such as the deference owed to a trial court's findings of fact. *See, e.g.*, *In re Lavender*, 399 F. App'x 649, 653 (2d Cir. 2010). In several of the cases cited by TANY, the court in fact held that reasonableness can be decided as a matter of law. *Simon Prop. Grp., L.P. v. Lumbermen's Mut. Cas. Co.*, 459 F. App'x 16, 18 (2d Cir. 2012) (resolving question of "reasonableness" in insurance dispute as a matter of law); *see also Jones v. Treubig*, 963 F.3d 214, 231 (2d Cir. 2020) ("[T]he reasonableness of an officer's view of the law is decided by the district court."). As the district court correctly recognized, "[t]his Circuit's caselaw [] does not support the proposition that merely by reciting the phrases 'dormant Commerce Clause' and 'right to travel,' a plaintiff has stated a claim for relief or that complaints alleging violations of those constitutional provisions can be resolved only after discovery." SA-148.

Second, TANY argues that because trucks make up a smaller percentage of vehicles within the CBD than do passenger vehicles, taxis, and FHVs—4%, to be precise—it is unreasonable for the toll's most expensive rates to fall on a minority of motorists. A-23-42 ¶¶ 13, 42, 130, 137, 142, 145; Br. 21-23. But this is nothing

more than a policy disagreement with the Program's toll rate structure. Each individual truck contributes more to congestion than an individual passenger vehicle or a taxi, and therefore it is reasonable for TBTA to charge each truck a higher toll rate for entry to the CBD. The fact that trucks make up 4% of vehicles in the CBD is irrelevant in determining whether the toll amounts charged to individual trucks are reasonable, as compared to individual passenger cars.

TANY does not cite any authority to suggest that the Constitution requires that tolls be apportioned between individual vehicles according to each vehicle *class*'s respective use of a facility. To the contrary, courts have consistently held that states are free to charge different toll rates to different classes of vehicles, as they see fit, so long as the distinctions are not "wholly irrational." SA-162; *see Selevan II*, 711 F.3d at 259 n.5 (distinctions between vehicle classes need not be "based solely on usage"). In *Evansville*, the Supreme Court upheld a *complete* exemption for active members of the military from the $1 tax imposed on other airport passengers. 405 U.S. at 717 n.7. And in *Selevan II*, this Court upheld a toll scheme that charged residents of Grand Island only 9% of the general passenger rate, 711 F.3d at 255, finding it was not "wholly irrational" to provide "a near exemption" to residents who "may need to . . . pay the toll several times a day." *Id.* at 259.

The First Circuit's decision in *American Trucking Associations, Inc. v. Rhode Island Turnpike & Bridge Authority* is instructive. 123 F.4th at 46. There, the First

Circuit concluded it was not "wholly unreasonable" for Rhode Island to impose bridge tolls *solely* on large trucks, despite the fact that large trucks only accounted for 3% of total bridge traffic. *Id.* at 49.[12] As the First Circuit explained, it was enough that those trucks had a disproportionate impact on the tolling facility because of their weight and size. *Id.* If a tolling structure that *only* targets trucks is constitutionally permissible, then the Program's tolls—which apply to nearly all vehicles entering the CBD—must be constitutionally permissible as well.

Third, TANY alleges that the Program charges trucks in a way (per-trip, rather than per-day) that is different "in kind" from other classes of vehicles. A-40 ¶ 130, Br. 22. But as the district court observed, about 65% of vehicles in the CBD (taxis, FHVs, trucks, and buses) are subject to per-entry or per-trip charges. SA-50. And it is not relevant that the toll for taxi and FHV trips is paid by the passenger, rather than the registered vehicle owner or operator. *See Evansville*, 405 U.S. at 714 ("[W]e do not think it particularly important whether the charge is imposed on the passenger himself, to be collected by the airline, or on the airline, to be passed on to the passenger if it chooses."). More fundamentally, there is nothing irrational about charging trucks for each time they enter the CBD. As TANY concedes, trucks are more likely than passenger vehicles to enter the CBD multiple times per day, thereby

---

[12] As Judge Liman observed in his Decision, TANY initially relied on the district court's decision in *Am. Trucking Ass'n, Inc. v. Alviti*, 630 F. Supp. 3d 357, 366 (D.R.I. 2022), but it was reversed by the First Circuit. SA-166; 123 F.4th 27.

contributing more to congestion and justifying a more frequent toll charge. Br. 22. Just as a higher fee may be levied where it is not based on a wholly unreasonable division between classes of vehicle, a more frequent fee may be imposed pursuant to the same standard. *See Angus Partners*, *LLC v. Walder*, 52 F. Supp. 3d 546, 568 (S.D.N.Y. 2014) ("Nor does the fact that tolls are assessed on a per-trip basis render the toll burden unfair."); *accord Janes*, 977 F. Supp. 2d at 339-40. Notwithstanding TANY's policy disagreements, TBTA had numerous rational bases for imposing a higher toll rate and more frequent tolls on trucks than on smaller vehicles.

Fourth, TANY suggests that the air and noise pollution caused by trucks is somehow not relevant to the Program's goals, Br. 24-25, but it was obviously rational to take those concerns into account given the TMA's focus on "the health, safety, and livelihood of … New Yorkers." N.Y. Veh. & Traf. Law § 1701; *see also id.* (citing "decreased air quality"); N.Y. Veh. & Traf. Law § 1706 (requiring reporting on, *e.g.*, "environmental improvements, including but not limited to, air quality, and emissions trends in and around the central business district"); TMRB Rep. at 6 (explaining tolling structure is "designed to **reduce congestion** and **reduce air pollution**" (emphasis in original)). Indeed, "the Supreme Court has blessed a broad 'variety of measures of actual use,'" and TANY offers no reason why the burden of air and noise pollution should be a prohibited consideration when managing traffic congestion. *Am. Trucking*, 123 F.4th at 47 (quoting *Evansville*, 405 U.S. at 715); *see*

*also Cnty. of Rockland*, slip op. at 17 (holding that the Program's goals of "reduc[ing] congestion and pollution" are "legitimate government interests" and that the Program is "rationally related" to furthering those interests).

Fifth, TANY argues that the Program tolls charged to trucks are irrational because the market forces shaping the trucking industry mean that truckers are unable to alter "their routes, and the timing of those routes." Br. 22.[13] But this ignores the Program's revenue-raising goal. *See supra* at 7; *see also Cnty. of Rockland*, slip op. at 17 (explaining that one of the Program's goals is to "provide capital funding for mass transit"). Not only does the Program act to reduce the level of congestion through tolling, but the Program's tolls are re-invested in New York's mass transit infrastructure, thereby further reducing congestion by improving bus, rail, and subway services. As this Court has explained: "the Program aims to benefit all toll payers by reducing traffic congestion in the CBD generally . . . [because it] seeks to improve roadway congestion by deterring commuters from driving into the CBD and by raising funds for public-transit systems." *Cnty. of Rockland*, slip op. at 15. And, as the district court observed, despite TANY's complaints that they cannot shift their transportation to transit, A-23 ¶¶ 14-16, Appellees could reasonably conclude that trucks would benefit from reduced congestion. SA-81

---

[13] This argument also essentially refutes TANY's F4A claim, because it undermines TANY's contention that the Program affects motor carriers' "routes and services." Br. 27.

("[b]ecause of the reduced congestion, trucks are also expected to be able to make more deliveries in the same time, thus increasing revenues"); SA-162 ("trucks . . . would derive more benefit from improvements [] in the form of more efficient and quicker transit"); *see Angus Partners*, 52 F. Supp. 3d at 564-66 ("the benefits of reduced traffic congestion, which include lower fuel costs, reduced stress, and more predictable wait times, are conferred to motorists each time they . . . avoid traffic that would occur in the absence of functioning mass transit").

Fundamentally, the fair approximation test "does not require precise tailoring, or a pre-enactment administrative record, for toll amounts to be justified." *Janes*, 977 F. Supp. 2d at 340. A law that "is based on some fair approximation . . . will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users." *Evansville*, 405 U.S. at 717-18 (all that is required is "a fair, if imperfect, approximation of the use"). TANY's allegations, even taken as true, do not establish that the Program's toll rates are "wholly irrational" and, much less, unconstitutional.

## II. TANY Did Not Plausibly Allege a Violation of the F4A Preemption Clause

TANY argues that the Program is preempted by the F4A because it is "intended" to have, and its implementation will have, a significant effect on the prices, routes and/or services of motor carriers. Br. 28. This claim is entirely novel—no court has ever held that the F4A preempts tolls imposed on motor

trucks—and it was properly dismissed by the district court for two reasons: (1) the F4A was not intended to, and does not apply to (let alone preempt) tolling programs; and (2) even if the F4A could theoretically apply, the Program is not preempted because it falls under the F4A's express statutory exception.

### A. The Scope of Preemption

"[E]very preemption case starts with the presumption that Congress did not intend to displace state law" and "[t]he heavy burden of overcoming this presumption falls on the party alleging preemption." *N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y.*, 850 F.3d 79, 86-87 (2d Cir. 2017). In evaluating the scope of a federal statute's preemptive effect, "the purpose of Congress is the ultimate touchstone." *Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 49 (2d Cir. 2018). As the Supreme Court has explained, when Congress enacted the F4A, its purpose was to combat states' "direct substitution of [their] own governmental commands for competitive market forces in determining (to a significant degree) the services that motor carriers will provide." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 263 (2013) (internal citation and quotation marks omitted). In this targeted respect, the F4A is designed to preempt only "certain aspects of the State regulatory process." *Id.*

To that end, the F4A provides that a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price,

route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). While TANY and Amicus American Trucking Association ("ATA") are correct that the F4A is based in large part on the Airline Deregulation Act ("ADA"), they neglect to note that the F4A's preemption clause contains "one conspicuous alteration" from the ADA. *Dan's City Used Cars, Inc.*, 569 U.S. at 261. Specifically, the F4A's preemption clause includes the words "with respect to the transportation of property," which "massively limits the scope of preemption." *Id.* Thus, for the purposes of F4A preemption, "it is not sufficient that a state law relates to the 'price, route, or service' of a motor carrier in any capacity." *Id.* All that is "forbidden" are state laws with a "'*significant* impact' on carrier rates, routes, or services." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 375 (2008).

Put another way, state laws that affect motor carrier rates, routes, or services in a "tenuous, remote or peripheral" manner are beyond the scope of F4A preemption and are unaffected. *Id.* (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 390 (1992)). This "focuse[s] the preemption on economic regulations and reflect[s] congressional intent to leave the state's historic police powers undisturbed where 'only incidental economic burdens can be discerned.'" *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 645 (2d Cir. 2005) (internal citation omitted).

### B. The F4A Does Not Apply to Tolling Programs

As the district court observed, in the thirty years since the F4A was enacted, no court has ever held that the F4A preempts a tolling program. SA-87. And for good reason: federal restrictions on tolling are contained in an entirely different federal statutory scheme, enacted decades before the F4A. *See* 23 U.S.C. §§ 129, 301 (1958). There is zero evidence to suggest that, in passing the F4A, Congress intended to surreptitiously preempt state tolling programs authorized under previously enacted federal tolling statutes. *See Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 330 (1997). Indeed, when Congress amended the F4A's preemption provision in the Transportation Equity Act for the 21st Century of 1998, it reaffirmed the federal statute under which the Program is authorized, Section 1012(b) of the Intermodal Surface Transportation Efficiency Act ("ISTEA"), by amending that statute and appropriating funds for additional value pricing pilot programs. Pub. L. 105-178, §§ 1216, 4016, 1101(12) (June 9, 1998). Congress therefore obviously "expected" that value pricing programs, such as the Program here, "would continue," and gave no indication of a congressional intent to preempt tolls on motor carriers. *Dillingham*, 519 U.S. at 330.

This conclusion is reinforced by the House Conference Report that accompanied the F4A, which this Court has already held is indicative of the statute's preemptive scope. SA-73 (quoting *Ace Auto Body & Towing, Ltd. v. City of New*

*York*, 171 F.3d 765, 772 (2d Cir. 1999)). That report identifies which regulations the F4A was concerned with, including restrictions on new trucking businesses to prevent their entry into the market, regulations dictating *how* a company could change its prices, and price controls aimed at keeping prices "high enough to cover all costs." H.R. Conf. Rep. 103-677, 86 (1994). Notably, the House Conference Report identified seven states that did "not regulate" intrastate prices, routes, or services of motor carriers, yet those states all had highway tolls at the time of the F4A's implementation. *See* SA-75. The implication is clear: "Congress determined that the laws then in existence in those jurisdictions," including tolls, "did not contravene its deregulatory goals and thus were not preempted." *Id.* (quoting *Bedoya*, 914 F.3d at 819). Instead, the district court correctly noted that Congress "has long acknowledged states' authority to impose tolls on motorists." SA-84 (collecting cases and statutes).

As a result, TANY has no basis for its argument that Congress, through the F4A, intended to preempt a tolling program that is specifically authorized under federal law, applies to the general public at large, does not target specific motor carriers, and "does not speak" to motor carriers' "prices, routes, or services." *Omya, Inc. v. Vermont*, 33 F. App'x 581, 584 (2d Cir. 2002); *see also Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 647 (9th Cir. 2014) (state regulations that do not "directly or indirectly mandate, prohibit, or otherwise regulate certain prices, routes,

or services" are not preempted by the F4A). If accepted, TANY's argument—that Congress intended to give trucks and only trucks a special exemption from federally authorized tolling programs, including congestion pricing tolling programs authorized by ISTEA—would obviously have disastrous consequences for transportation projects across the nation. Indeed, it would effectively invalidate all existing tolls applying to motor carriers, as virtually all tolls incentivize drivers to take an untolled route, and some regions—such as Staten Island—lack a toll-free route for vehicles at all. *See Duffy*, 784 F. Supp. 3d at 678. "Basic principles of statutory interpretation" strongly weigh against such a nonsensical position. *Jones v. Hendrix*, 599 U.S. 465, 478 (2023) (statutes must be read "in harmony"); *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 112 (2014) (recognizing canon against implied repeal and canon that the more specific statute controls over the more general statute).

### C. The *Bedoya* Factors Weigh Against Preemption

The F4A's inapplicability here is confirmed by the four factors courts commonly use to determine if a state law is preempted by the F4A. SA-78 (citing *Bedoya*, 914 F.3d at 821-23) (collecting cases). Those factors are whether the law: (1) "applies to all businesses or whether it focuses on motor carriers"; (2) addresses the carrier's relationship with its customers or addresses another relationship such as the carrier's relationship with its employees; (3) "binds the carrier to provide a

particular price, route, or service"; and (4) risks creating a "patchwork" of differing state "service-determining laws." *Id.* (quoting *Bedoya*, 914 F.3d at 823).

As to the first factor, the Program clearly applies to "all businesses," and not just motor carriers. Indeed, the Program's tolls are imposed on almost *anyone* who drives into the CBD. And even the rates that truckers must pay to enter the zone are identical to those paid by intercity or tour buses of equivalent sizes; there is no unique toll (or rate) for motor carriers. *See* supra at 8. The Program is plainly the type of law "directed at 'members of the general public' [which is] usually viewed as not having a direct effect on motor carriers." *Bedoya*, 914 F.3d at 821.

For the second factor, TANY did not (and could not plausibly) allege that the Program was aimed at the customer-carrier relationship. SA-80; SA-144; A-66. As the district court observed, "laws that affect the way a carrier interacts with its customers fall squarely within the scope of FAAAA preemption." SA-80 (quoting *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1054 (7th Cir. 2016)) (alteration omitted). On the other hand, "background regulations that are several steps removed from prices, routes, or services . . . are not preempted, even if employers must factor those provisions into their decisions" about prices, routes, or services. *Id.* (quoting *Dilts*, 769 F.3d at 646).

TANY does not attempt to argue that the Program somehow operates "at the point where carriers provide services to customers at specific prices." *Id.* (quoting

*Dilts*, 769 F.3d at 646). Nor could it. The Program, like any other toll, impacts a resource "input," just like labor laws (which impact labor costs), intellectual property laws (which impact technology costs), and tax laws. SA-78 (quoting *S.C. Johnson & Son, Inc. v. Transp. Corp. of Am.*, 697 F.3d 544, 558 (7th Cir. 2012)) (collecting cases). While these regulations *may* theoretically "shift[] incentives and make[] it more costly for motor carriers to choose some routes or services *relative* to others," that connection is too remote to trigger preemption. *Dilts*, 769 F.3d at 647 (emphasis in original). In other words, even assuming the Program's tolls would increase motor carriers' costs, they nevertheless would not "impede the ability of market forces to inform carrier prices." SA-82; SA-144. Indeed, the EA (on the page after the one cited in TANY's complaint, A-31 n.6) predicts that "if the competitive market will support" it, diluted toll costs "may" be passed along to receivers, customers, or absorbed by the drivers and shippers themselves. EA 6-39, 6-40.

As to the third factor, TANY concedes, as it must, that the Program does not "require" or "mandate" or "bind," *Dilts*, 769 F.3d at 646-47, motor carriers to change their rates, routes, or services. The only thing the SAC alleges motor carriers "must" do because of the Program is "alter their billing systems, renegotiate contracts, and correct daily billing errors." Br. 17-18, 29. But that is plainly insufficient for preemption, as those are all changes a motor carrier must consider for a variety of

regulations (and certainly, for any change in toll rates). *Dilts*, 769 F.3d at 649 ("[T]he mere fact that a motor carrier must take into account a state regulation when planning services is not sufficient to require FAAAA preemption"). TANY has itself taken the position that its members' routes and services will be unaffected by the Program, starkly undermining its claims that the Program has a substantial effect on truck routes or services. Br. 27; A-30 ¶ 69, SA-6 ¶¶ 37 ("the industry must make their deliveries in the Zone based upon customer requirements and logistical constraints."); A-40 ¶ 72, SA-7 ¶ 40 ("the Tolling Program's off-peak pricing 'concession' has little to no effect on TANY members' delivery schedules").

*Dilts* is instructive. There, the Ninth Circuit held that California's meal and rest-break laws were not preempted, even though requiring motor carriers to provide their employees with those breaks would necessarily impact prices, routes, and services. *Dilts*, 769 F.3d at 647. Similarly, in *Bedoya*, the Third Circuit found that New Jersey's test for classifying employees as independent contractors was not preempted, because although it *could* increase costs or burdens on motor carriers, it did not "bind" the carriers to a single method of compliance. 914 F.3d at 822-23. In both cases, as here, the state law at issue had a remote impact on prices, but one that was not direct, and did not prescribe a specific method of compliance.

ATA takes issue with the district court classifying this third factor as the "most important," ATA Br. 3-4, 8; *see* SA-82, but it is entirely logical to conclude that

whether a state law "binds" a motor carrier to a particular route, price, or service would be highly relevant to the F4A analysis in light of the purpose of the F4A, which is to combat states' "direct substitution of [their] own governmental commands for competitive market forces in determining (to a significant degree) the services that motor carriers will provide." *Dan's City Used Cars, Inc.*, 569 U.S. at 263. In any event, the "binds" inquiry is just one factor, and the relevant inquiry looks to other factors that ATA does not address at all. The district court concluded that *none* of the factors favored a finding of preemption, so ATA's concerns are largely academic. SA-79-87; A-55-56.

While ATA claims that the "binding" inquiry is absent from the Supreme Court's caselaw, that is not correct. ATA Br. 8. The *Morales* Court took issue with "the guidelines establish[ing] binding requirements as to how tickets may be marketed if they are to be sold at given prices," which "compell[ed] or restrict[ed] advertising" altogether. 504 U.S. at 387-89. And, applying *Morales*, the court in *Rowe* invalidated a Maine law that "focuse[d] on trucking and other motor carrier services," and which "require[d] carriers to offer a system of services that the market does not now provide." 552 U.S. at 371-72. Finally, in *Northwest, Inc. v. Ginsberg*, the relevant common law claim would have required the award of valuable benefits to a customer. 572 U.S. 273, 284 (2014). All of these examples strongly diverge from the Program's imposition of higher tolls on trucks, which is commonplace

throughout the country. The Program does not tell motor carriers they have to do anything different in light of the CBD tolls. Some carriers may raise prices, others may change routes, and some may choose to do neither. But, at bottom, their choices will be driven by market conditions, not by any legal requirement.

As to the final factor, the risk of a "patchwork of service-determining laws," the district court properly concluded that a toll does not "require[] motor carriers to alter their conduct as they move from jurisdiction to jurisdiction." SA-86. Usually, this factor concerns labor standards or tort laws, which generally (but often permissibly) subject motorists to different standards from state to state. SA-86-87 (collecting cases); *see City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 441 (2002) (observing that "discrete, nonuniform safety regulations applicable to each of [a state's] several constituent municipalities" would not offend F4A). All the Program requires is payment of a toll, often (but not mandatorily) using the same E-ZPass tag that is already mounted to a truck. As the district court properly observed, the choice whether to incur a toll at a certain time or location "is mandated by every toll a driver encounters; some drivers will elect to avoid toll roads (by taking alternate paths or deciding not to drive altogether), while others will pay for the convenience or necessity of using the road." SA-84.

### D. The Program Does Not "Target" Motor Carriers

TANY insists that the Program "targeted" motor carriers because its alleged "intent" is to change their prices, routes, or services by offering an overnight period discount. Br. 28; A-44 ¶¶ 162-65. But it is extremely commonplace for tolling authorities to charge different rates during peak and non-peak hours,[14] and the 75% overnight discount applies equally to all categories of vehicles (apart from taxis and FHVs), and not just to trucks. TANY cites no authority to suggest that a state's intent is relevant to the preemption analysis; rather when it comes to preemption, "the purpose of Congress is the ultimate touchstone." *Coal. for Competitive Elec., Dynergy Inc.*, 906 F.3d at 49; *see also Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*, 613 F.3d 206, 217 (D.C. Cir. 2010) (rejecting similar intent-based argument, and explaining only relevant question is whether state regulation is "related to a price, route, or service"). There is zero evidence that Congress intended the F4A to preempt every tolling program that charges peak and non-peak truck tolls, yet that is the consequence of TANY's position.

What's more, even if intent were relevant, there is no evidence that the Program was adopted with the goal of altering motor carrier behavior. The TMA's *only* mention of trucks is a requirement that TBTA report on "the current and historic volume and type of vehicles including, but not limited to, commercial trucks,

[14] *See, e.g.*, https://www.panynj.gov/bridges-tunnels/en/tolls.html.

transportation network companies, taxis, private cars, and tour buses, entering the central business district" every two years. N.Y. Veh. & Traf. Law § 1706. The EA estimated that under the Program, "the volumes of truck journeys into and within the Manhattan CBD are expected to remain similar to today because the need to deliver goods would remain the same." EA at 6-63. And to the extent the TMRB report discusses the toll rates for trucks (which are comparatively *lower* than at other facilities in the New York region), it emphasizes that those rates were chosen to "minimize unnecessary diversions" by trucks, *i.e.*, to prevent incentivizing trucks to change their routes. TMRB Rep. at 20. Indeed, as noted, TANY has itself taken the position that its routes and services are unaffected by the Program. *See supra* at 34. While the TMRB Report does say that nighttime discounts might incentivize *some* change in travel patterns where possible, again, those overnight period discounted rates are afforded to nearly *all* motorists—not just trucks. *Supra* at 8, 37. To be sure, "of course, . . . prices alter behavior" and "prices that vary from place to place will yield incentives that vary as well." *Air Transp. Ass'n of Am.*, 613 F.3d at 218. But "neither the [Airline Deregulation Act of 1978] nor any other statute . . . demands uniform prices or uniform incentives." *Id.* at 216-17.

## III. Even if the F4A Applied, the Program Is a Permissible Weight and Size Limitation

The district court also properly concluded that even if the F4A applied, and it does not, the Program would nevertheless be a permissible regulation under "the

authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle." SA-88 (citing 49 U.S.C. § 14501(c)(2)(A)); A-56 n.4. The Supreme Court recently clarified that this exemption is separate from (and additive to) other exceptions related to safety or imposing minimum insurance requirements on carriers. *Montgomery*, 146 S. Ct. at 1203. And TANY cannot plausibly allege that the toll rates for trucks are unrelated to their sizes or weights. *See supra* at 8.

TANY boldly asserts that "the TMRB Report . . . said nothing about their weights and sizes." Br. 31. That is patently false. The TMRB Report clearly says, "trucks . . . have an outsized impact on congestion, *because of their large size and large turning radii*." TMRB Rep. at 20 (emphasis added). The toll rates themselves are tied to the size of the truck, with larger trucks being charged more than smaller trucks. Toll Rate Sched. at 1. And again, trucks are not tolled at a higher rate than all other vehicles, but at a rate equivalent to similarly sized non-commuter buses. *Id.*

TANY also complains that commuter transit buses are exempt from the Program, but that is a rational distinction addressed by the court below. In brief, "public commuter buses may reduce congestion by consolidating many cars' worth of passengers into a single vehicle." SA-91. As noted earlier, intercity and tour buses are not exempt from the Program.

TANY's comparison of the toll rates for transit buses and trucks relies entirely on the now abrogated district court decision in *Colorado Motor Carriers Association v. Town of Vail*, 2023 WL 8702074, at *10 (D. Colo. Dec. 15, 2023). There, when considering the separate safety exception, the district court concluded that the Town had failed to explain why some large motor carriers were *banned* from entering pedestrian mall areas, while large vehicles remained free to do so. *Id.* That case was *already* distinguishable here insofar as the TMRB Report explained that commuter buses "serve a public purpose and reduce congestion by offering affordable, predictable and safe transit service for millions of people." TMRB Rep. at 21. In any event, the Tenth Circuit reversed, finding that the District Court construed the safety exception too strictly, and all that was required was a "logical nexus" between the policy's contours and the purpose of the exception. *Colo. Motor Carriers Ass'n*, 153 F.4th at 1064. The unexplained exemptions for certain large vehicles did not render the safety exception inapplicable, but "simply reflect regulatory discretion." *Id.* at 1063.

So too here, the Program's exemption for transit buses (which reduce the number of cars on the road in the aggregate) does not remove the toll rates which are genuinely responsive to size and weight concerns from the scope of 49 U.S.C. § 14501(c)(2)(A). Instead, there is a "logical," indeed empirical, basis to exempt

transit buses from the otherwise generally applicable toll rates. TANY, as before, simply failed to allege facts that plausibly suggest otherwise.

## IV. The District Court Applied the Correct Standard

TANY claims that "the district court incorrectly required TANY to provide evidence to support its claims," Br. 33, but the reality is that TANY failed to plausibly allege facts in support of its claims.

On the Dormant Commerce Clause claim, the district court accepted as true TANY's allegation that trucks only make up 4% of traffic in the CBD. Br. 33; SA-165-66; A-53. TANY complains that the district court "credited MTA's bare assertion regarding the 'outsized impact' that trucks" have on congestion, but that assertion comes from a document TANY chose to incorporate into its complaint, *supra* at 8, and "where the plaintiff's allegations are contradicted by a document that the complaint incorporates by reference, the document controls." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 598 B.R. 102, 115 (S.D.N.Y. 2019) (internal citation and quotation marks omitted). In any event, the district court correctly concluded that TANY's sole allegation as to the proportion of vehicles in the CBD comprised of trucks is *not* "sufficient, standing alone," Br. 34, to overcome TANY's heavy burden to allege sufficient facts to plausibly claim that the Program is "wholly irrational." *Supra* at 22-26; A-58. As discussed above, this fact, if true, is not relevant to an individual truck's outsized impact compared to a passenger

vehicle. Similarly, when discussing the preemption claim, the district court repeatedly emphasized that TANY "alleges nothing about the Tolling Program, as applied, that would mandate that trucks take specific routes, or that they have no alternative other than subjecting their fleets to the charges imposed." A-65.

TANY claims that dismissal may only be granted "if it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claims which would entitle [it] to relief." Br. 33. That is not the standard. *See O'Grady v. BlueCrest Cap. Mgmt. LLP*, 646 F. App'x 2, 4 n.2 (2d Cir. 2016) (explaining the "no set of facts" standard has been "supplanted"). TANY was not required to proffer evidence but it did have to allege facts that stated a plausible claim. Even though the court explained the defects in TANY's complaint, *see* A-66, TANY proceeded to amend its complaint "without new relevant factual allegations." *Id.* Under those circumstances, the court properly applied the law of the case doctrine to dismiss the amended complaint. *Id.*

## **<u>CONCLUSION</u>**

For the foregoing reasons, the decision below should be affirmed.

Dated: July 13, 2026
New York, New York

Respectfully submitted,

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
Thomas A. Lloyd
KAPLAN MARTIN LLP
1133 Avenue of the Americas
Suite 1500
New York, NY 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com
tlloyd@kaplanmartin.com

*/s/ Mark A. Chertok*
Mark A. Chertok
Elizabeth Knauer
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, New York 10022
Tel.: (212) 421-2150
mchertok@sprlaw.com
eknauer@sprlaw.com

*Attorneys for Defendants-Appellees the Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority*

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits requirements of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 10,383 words, excluding those portions pursuant to Fed. R. App. P. 32(f).

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) because it was prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 14 Times New Roman font.

Dated: July 13, 2026<br>
New York, New York

*/s/ Roberta A. Kaplan*<br>
Roberta A. Kaplan

## CERTIFICATE OF SERVICE

I, Roberta A. Kaplan, counsel for Defendants-Appellees and a member of the Bar of this Court, certify that on July 13, 2026 copies of the foregoing brief were filed with the Clerk through the Court's electronic filing system, which will send notice of such filing to all counsel of record.

Dated: July 13, 2026
New York, New York

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan